2007 OK 65

**STATE of Oklahoma, ex rel. OKLA-HOMA BAR ASSOCIATION,
Complainant,**

v.

**Roland Vincent COMBS, III, Respondent.**

**SCBD No. 5219.**

Supreme Court of Oklahoma.

Sept. 11, 2007.

Janis Hubbard, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for Complainant.

Jack S. Dawson, Esq., Oklahoma City, OK, for Respondent.

OPALA, J.

¶ 1 In this disciplinary proceeding against a lawyer the issues to be decided are: (1) Does the record submitted for our examination provide sufficient evidence for a meaningful *de novo* consideration of the complaint and of its disposition?[1] and (2) Is suspension for two years and one day together with the payment of costs an appropriate disciplinary sanction for respondent's breach of acceptable professional demeanor? We answer the first question in the affirmative and the second in the negative.

## I

### INTRODUCTION TO THE RECORD

¶ 2 The Oklahoma Bar Association (Bar) commenced this disciplinary proceeding on 25 August 2006 against Roland Vincent Combs (respondent or Combs), a licensed lawyer, by filing a formal complaint in accordance with the provisions of Rule 6.1 of the Rules Governing Disciplinary Proceedings (RGDP).[2] The complaint alleges in two counts violations of the RGDP and of the Oklahoma Rules of Professional Conduct (ORPC).[3] A trial panel of the Professional Responsibility Tribunal (the trial panel or panel) conducted hearings (the PRT hearings) on 14 November 2006 and 29 November 2006. The parties submitted no stipulations.

¶ 3 Upon conclusion of the hearing and after consideration of the testimony and admitted exhibits, the trial panel issued its report finding that respondent violated certain provisions of the rules of professional conduct. The panel recommended that the respondent be suspended from the practice of law for two years and one day and that he pay the costs taxed in this proceeding.

## II

### THE RECORD BEFORE THE COURT PROVIDES SUFFICIENT EVIDENCE FOR A MEANINGFUL *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

¶ 4 In a Bar disciplinary proceeding the court functions as an adjudicating licensing authority that exercises exclusive original cognizance.[4] Its jurisdiction rests on the court's constitutionally vested, nondelegable power to regulate the practice of law, including the licensure, ethics, and discipline of this state's legal practitioners.[5] In deciding whether discipline is warranted and what sanction, if any, is to be imposed for the misconduct charged, the court conducts a full-scale, non-deferential, *de novo* examination into all relevant facts,[6] in which the

1. The record consists of a transcript of the hearing held before a trial panel of the Professional Responsibility Tribunal, exhibits offered by both parties, which were admitted into evidence at the hearing, and the trial panel's report.

2. The Rules Governing Disciplinary Proceedings are found in 5 O.S.2001, Ch.1, App. 1–A.The provisions of RGDP Rule 6.1 state:
 "The proceeding shall be initiated by a formal complaint prepared by the General Counsel, approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court."

3. The Oklahoma Rules of Professional Conduct are found in 5 O.S.2001, Ch. 1, App. 3–A.

4. *State ex rel. Okla. Bar Ass'n v. Leigh*, 1996 OK 37, ¶ 11, 914 P.2d 661, 666; *State ex rel. Okla. Bar Ass'n v. Eakin*, 1995 OK 106, ¶ 8, 914 P.2d 644, 647; *State ex rel. Okla. Bar Ass'n v. Bolton*, 1994 OK 53, ¶ 15, 880 P.2d 339, 344; *State ex rel. Okla. Bar Ass'n v. Donnelly*, 1992 OK 164, ¶ 11, 848 P.2d 543, 545; *State ex rel. Okla. Bar*

*Ass'n v. Raskin*, 1982 OK 39, ¶ 11, 642 P.2d 262, 265; *In re Integration of State Bar of Okla.*, 1939 OK 378, 95 P.2d 113, 115.

5. *Eakin, supra* note 4 at ¶ 8, at 648; *State ex rel. Okla. Bar Ass'n v. Downing*, 1990 OK 102, ¶ 12, 804 P.2d 1120, 1122–1123; *Raskin, supra* note 4 at ¶ 11, at 265–266.

6. *State ex rel. Okla. Bar Ass'n v. Stubblefield*, 1988 OK 141, ¶ 7, 766 P.2d 979, 982; *Leigh, supra* note 4; *Eakin, supra* note 4 at ¶ 8, at 647–648; *State ex rel. Okla. Bar Ass'n v. Lloyd*, 1990 OK 14, ¶ 8, 787 P.2d 855, 858; *State ex rel. Okla. Bar Ass'n v. Cantrell*, 1987 OK 17, ¶ 1, 734 P.2d 1292, 1293; *State ex rel. Okla. Bar Ass'n v. Brandon*, 1969 OK 28, ¶ 5, 450 P.2d 824, 827. Because this court's cognizance of disciplinary jurisdiction cannot be shared with any other institution, every aspect of the Bar's adjudicative process must be revisited by our *de novo* consideration. **The attribute of nondelegable jurisdiction** serves to distinguish the conduct of Bar disciplinary functions from trial *de novo*—a retrial in a different court—or even from de novo

conclusions and recommendations of the trial panel are neither binding nor persuasive.[7] In this undertaking we are not restricted by the scope-of-review rules that govern corrective relief on appeal or on certiorari, proceedings in which another tribunal's findings of fact may have to be left undisturbed by adherence to law-imposed standards of deference that test the legal correctness of a lower tribunal's fact findings.[8]

¶ 5 The court's duty can fully be discharged only if the trial panel submits a complete record of the proceedings.[9] Our initial task is to ascertain whether the tendered record is sufficient to permit (a) this court's independent determination of the facts and (b) its crafting of an appropriate discipline. The latter is that which (1) is consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) avoids the vice of visiting disparate treatment on the offending lawyer.[10]

¶ 6 Having carefully scrutinized the record submitted to us in this proceeding, we conclude that it is adequate for our *de novo* consideration of respondent's alleged professional misconduct.

appellate review on the record, which stands for an independent, non-deferential re-examination *of another tribunal's record. De novo* re-examination means that the court redecides all issues of fact and law **anew** as if none has ever been resolved before.

7. *Eakin, supra* note 4 at ¶ 8, at 648; *Raskin, supra* note 4 at ¶ 11, at 265. The court's range of options in a disciplinary proceeding is set forth in RGDP Rule 6.15(a), 5 O.S.2001, Ch.1, App. 1–A, which states in pertinent part:
"The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate."

8. *Eakin, supra* note 4 at ¶ 8, at 648; *Bolton, supra* note 4 at ¶ 15, at 344; *State ex rel. Okla. Bar Ass'n v. Farrant,* 1994 OK 13, ¶ 7, 867 P.2d 1279, 1284. *Accord, Levi v. Mississippi State Bar,* 436 So.2d 781, 782 (Miss.1983).

9. The provisions of RGDP Rule 6.13, 5 O.S.2001, Ch. 1, App.1–A, state in pertinent part:

## III

## THE CHARGES AGAINST RESPONDENT

### A. Count I—The Randles Complaint

¶ 7 In August of 2004 Kenard Randles (Randles) hired the respondent Combs to probate the estate of his deceased wife, Pamela Randles, and paid Combs a retainer of $1,800. Randles was not named the personal representative in his wife's will. It was Mr. Anthony Jameson (Jameson), the decedent's brother, who was appointed personal representative of the estate.[11]

¶ 8 In connection with the estate's probate Combs brought suit for the wrongful death of the decedent and entered into a contingent fee agreement with Jameson under which 35% of any funds collected would be retained by Combs and the remaining 65% would be deposited to the estate's credit. Combs settled the wrongful death claim for $10,000. Of the total amount recovered, $3,500 belonged to Combs and $6,500 to the estate.

¶ 9 A minimum balance of $6,500 should have remained in Combs' trust account as the amount belonging to the estate of Pamela Randles. The recovered $10,000 was deposited in Combs' trust account in early May 2005. Within that month the balance in the trust account dropped to $500.73. During

"Within thirty (30) days after the conclusion of the hearing, the Trial Panel shall file with the Clerk of the Supreme Court a written report which shall contain the Trial Panel's findings of fact on all pertinent issues and conclusions of law (including a recommendation as to discipline, if such is found to be indicated, and a recommendation as to whether the costs of the investigation, record and proceedings should be imposed on the respondent), and shall be accompanied by all pleadings, a transcript of the proceeding, and all exhibits offered there at. . . ."

10. *Eakin, supra* note 4 at ¶ 9, at 648; *Bolton, supra* note 4 at ¶ 16, at 345; *State ex rel. Okla. Bar Ass'n v. Perceful,* 1990 OK 72, ¶ 5, 796 P.2d 627, 630.

11. A Bar grievance was initially filed by Randles, not Jameson, and involved claims that are not under discussion here. The Bar investigated Randles' complaint and chose not to pursue it, but during that investigation the Bar discovered the issues associated with Combs' trust account, which are here under consideration.

the month of June 2005 Combs' trust account balance fell as low as $31.31. The $6,500 due the estate was paid in June of 2006, **after the Bar had begun investigating Combs' trust account handling in connection with this and another complaint.**

¶ 10 Combs fully admits to and apologizes for withdrawing an excessive amount of money from the trust account and placing it in his operating account. During the time the balance fell below $6,500 Combs states that he was involved in activities connected with the opening a law office in Dallas, Texas and spent a considerable amount of time away from his Oklahoma City office. Combs testified that he relied on his Oklahoma City staff to deal with certain office affairs and stated that the removal of excessive funds from the trust account was caused by an error in communication between him and his staff by which he was led to believe he was entitled to the money as a fee. The staff testified that Combs was notified of the error within two months of the occurrence. Combs contends that he was not informed until much later, although the specific time frame within which he acquired the knowledge was not revealed.

¶ 11 Jameson testified that he phoned Combs periodically to inquire about the status of the account and of the estate and was told Combs was continuing to work on the matter. Jameson believed the $6,500 had been continuously maintained in the trust account.[12]

¶ 12 In relation to count one the Bar alleges violations of the provisions of ORPC Rule 1.15,[13] ORPC Rule 8.1(b),[14] ORPC Rule 8.4(a),[15] ORPC Rule 8.4(c),[16] RGDP Rule 1.3,[17] RGDP Rule 1.4,[18] and RGDP Rule 5.2.[19]

12. The record does not indicate whether Jameson's account inquiries were made before or after Combs became aware of the error in the funds' removal. The record does indicate that despite the Bar grievance, Combs, at the time of the hearing, remained counsel for Pamela Randles' estate and the estate had yet to be closed.

13. The pertinent provisions of ORPC Rule 1.15, 5 O.S.2001 Ch. 1, App. 3–A, state: ''(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.''

14. The pertinent provision of ORPC Rule 8.1(b), 5 O.S.2001 Ch. 1, App. 3–A, states: ''... a lawyer ... in connection with a disciplinary matter, shall not: * * * * * (b) ... knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, ...''

15. The provisions of ORPC Rule 8.4(a), 5 O.S. 2001 Ch. 1, App. 3–A, state: ''It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct ...''

16. The provisions of ORPC Rule 8.4(c), 5 O.S. 2001 Ch. 1, App. 3–A, state: ''It is professional misconduct for a lawyer to: * * * * * (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; ...''

17. The provisions of RGDP Rule 1.3, 5 O.S.2001 Ch. 1, App. 1–A, state: ''The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.''

18. The pertinent provisions of RGDP Rule 1.4(b), 5 O.S.2001 Ch. 1, App. 1–A, state: ''Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose ... and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion.''

19. The pertinent provisions of RGDP Rule 5.2, 5 O.S.2001 Ch. 1, App. 1–A, state: ''After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either ... (2) file and serve a copy of the grievance ... upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and

¶ 13 Combs admits to a violation of ORPC Rule 1.15 (mishandling of funds) and in essence, concurrently with the specified admission, also admits to violating ORPC Rule 8.4(a), RGDP Rule 1.3, and RGDP Rule 1.4(b). We accept Combs' admission and find from clear and convincing evidence that his conduct, which violated those rules, constitutes grounds for the imposition of professional discipline. We employ three different culpability standards in evaluating mishandling of funds. Those are called (1) commingling;[20] (2) simple conversion;[21] and (3) misappropriation, i.e., "theft by conversion or otherwise."[22] The degree of culpability ascends from the first to the last. Each must be proved by clear and convincing evidence.[23]

¶ 14 *Commingling* occurs when the client's funds are combined with the lawyer's personal funds. Complete separation of a client's money from that of the lawyer's is the only way for maintaining proper accounting.[24] When an attorney receives money, part of which is to be paid to a third person and part of which is for the lawyer's fee, all the funds not clearly identifiable as those of the lawyer must be kept separate.[25]

¶ 15 The second level of culpability is *simple conversion.* Rule 1.4(b) establishes that simple conversion occurs when an attorney applies a client's money to a purpose other than that for which it came to be entrusted to the lawyer.[26]

¶ 16 The third level of culpability is *misappropriation, i.e. "theft by conversion or otherwise."* This occurs when an attorney has *purposely* deprived a client of money through *deceit and fraud.*[27] A lawyer found guilty of intentionally inflicting *grave economic harm* in mishandling clients' funds is deemed to have committed this most grievous degree of offense.[28] A finding that the attorney did so *intentionally,* regardless of exceptional miti-

---

circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline ..."

**20.** For the prohibition of "commingling", see Rule 1.15(a), *supra* note 13, which states in part that "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property". *State ex rel. Okla. Bar Ass'n v. Johnston,* 1993 OK 91, ¶ 21, 863 P.2d 1136, 1144.

**21.** For the rule against "simple conversion", see Rule 1.4(b), *supra* note 18, which states that "[W]here money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose .... and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion". *Johnston, supra* note 20 at ¶ 21, 863 P.2d 1136.

**22.** RGDP Rule 1.4(c), 5 O.S.2001 Ch. 1, App. 1–A provides that "[t]heft by conversion or otherwise of the funds of a client shall, if proven, result in disbarment." (Emphasis added.) These rules connote that "theft", rather than a mere simple conversion, will always dictate disbarment. *Johnston, supra* note 20 at ¶ 21, 863 P.2d 1136.

**23.** The terms of Rule 6.12(c), RGDP, 5 O.S.1981 Ch. 1 App. 1–A are: "To warrant a finding against the respondent in a contested case, the charge or charges *must be established by clear and convincing evidence. ..."* (emphasis added). *Johnston, supra* note 20 at ¶ 21, 863 P.2d 1136.

**24.** When no means exist to account for money, it becomes a fungible unidentifiable property. Once money is combined, the only way in which a determination can be made of the divisible parts is the accounting methods employed. The attorney has exclusive control over the management of funds entrusted to him. Keeping a client's money separate and distinct ensures that the money at *all* times is properly accounted for and can be shown to be distinct. This serves to prevent a lawyer from deliberately or mistakenly using any of the funds entrusted to him. "In their daily work lawyers commonly come into clients' funds. The trust placed in the lawyer owes its origin to the special professional status he occupies as a licensed practitioner. Public confidence in the practitioner is essential to the proper functioning of the profession. Few breaches of ethics are as serious as the act of commingling a client's funds and the unwarranted use of his money." *Raskin, supra* note 4 at ¶ 14, 642 P.2d 262.

**25.** Rule 1.15(a), *supra* note 13; *Johnston, supra* note 20 at ¶ 22, 863 P.2d 1136.

**26.** Rule 1.4(b), *supra* note 18; *Johnston, supra* note 20 at ¶ 24.

**27.** *Johnston, supra* note 20 at ¶ 25, 863 P.2d 1136.

**28.** *Id.*

gating factors,[29] mandates the imposition of harsh discipline—i.e. disbarment.[30]

¶ 17 The Bar and the trial panel viewed Combs' conduct as rising to the third level of culpability—to that of misappropriation. **We disagree.** There is no evidence that Combs purposely deprived Jameson of the funds by deceit or fraud or that Combs intentionally inflicted on Jameson grave economic harm. There is an admission of guilt and evidence supporting culpability for commingling and simple conversion. Combs transferred the money from the trust account to his operating account and used the money for personal expenses.

¶ 18 A violation of ORPC Rule 8.1(b) (a knowing failure to respond to a demand for information in a disciplinary matter) has been charged by the Bar. The trial panel did not rule on a violation of ORPC Rule 8.1(b) and Combs neither admits nor denies a violation. We must not be unmindful that the Bar bears the burden of proving facts by clear and convincing evidence.[31] Our examination of the record shows an absence of clear and convincing evidence that he knowingly failed to produce information or that Combs has continued to fail to produce information.[32]

 ¶ 19 The trial panel found Combs guilty of a violation of ORPC Rule 8.4(c) (that he engaged in conduct involving dishonesty, fraud, deceit or misrepresentation). Combs denies this violation and we do not find clear and convincing evidence that the respondent acted dishonestly or with the intent to defraud or deceive. The facts indicate that the money was removed from the trust account by error under the mistaken belief that the funds constituted an earned fee. The Bar contends that Combs made misrepresentations to Jameson by claiming to be "still working on [the estate]." A misrepresentation must be shown by clear and convincing evidence that the declarant had an underlying motive (i.e., bad or evil intent) for making the statement.[33] We find the record devoid of not only improper motive but also of clear evidence that shows a misrepresentation. Combs states he did not immediately learn that the money had been removed from the trust account. When he gained that knowledge is in dispute.[34] Combs' responses could have been given during a time when he was unaware of the error. Evidence shows the estate is currently open and still being represented by Combs, meaning that he was and is still working on the matter. We find there is an absence of clear and convincing evidence to support an ORPC Rule 8.4(c) violation.

¶ 20 The trial panel did not rule on a violation of RGDP Rule 5.2 (that Combs, in his response to the Bar's grievance, did not make a full and fair disclosure of all the facts and circumstances pertaining to his alleged misconduct or that Combs made a deliberate misrepresentation in his response) and Combs neither admits nor denies a violation. As we view the evidence, it shows Combs was extremely negligent in his accounting procedures and thus the material provided in regards to his trust account was very disorganized. That his accounting was extremely

---

**29.** *Id.*

**30.** Rule 1.4(c), *supra* note 22; *Johnston, supra* note 20 at ¶ 25.

**31.** *State ex rel. Okla. Bar Ass'n v. Dobbs*, 2004 OK 46, ¶ 51, 94 P.3d 31, 55.

**32.** There was some discussion involving several ATM withdrawals from Combs' trust account. Combs testified that ATM access was not a service set up with the account and that he had attempted to confer with the bank about the withdrawals. The Bar asserts that Combs has failed to provide information explaining the ATM withdrawals. During the course of the hearings the bank documents were subpoenaed by the Bar but could not be prepared by the bank in time. At the end of the hearings the trial panel stated it was unnecessary to continue to seek the records and allowed the Bar to forego the proof sought to be secured by the subpoena. We find that given the instructions of the trial panel, Combs could have been led to believe the material was no longer being sought and did not have to be provided.

**33.** *Johnston, supra* note 20 at ¶ 16, 863 P.2d 1136; *State ex rel. Okla. Bar Ass'n v. Todd*, 1992 OK 81, ¶ 5, 833 P.2d 260, 263; *Okla. Bar Ass'n v. McMillian*, 1989 OK 16, ¶ 23, 770 P.2d 892, 899.

**34.** As stated in the facts, Combs' staff testified that Combs was notified two months after the error yet he contends that he did not learn of the error within two months but rather much later.

difficult, if not impossible, to audit does not mean that he did not provide all information or that he deliberately misrepresented the situation's reality. Combs has admitted to his mistakes and failures. **We do not find clear and convincing evidence of a RGDP Rule 5.2 violation.**

### B. Count 2—The "Rasel" Complaint

¶ 21 In June of 2005, in an agreement titled Commercial Purchase and Sale Agreement, Rasel A. Sheikh (Rasel) and Ayesha Khaton Sheikh (Ayesha) sold land owned by them to a third party. Located on this land were convenience stores owned by R & N Distributing Inc. (R & N).[35] The Commercial Purchase and Sale Agreement identified Rasel and Ayesha as "Sellers" and identified respondent Combs as "Sellers' Attorney." The agreement provided the land sale proceeds, $316,000, should be deposited in Combs' trust account.

¶ 22 In July of 2005 Rasel and Ayesha entered into a second agreement in connection with the land sale, titled Agreement Regarding Sale of Real Estate Property. Unlike the Commercial Purchase and Sale Agreement, Combs was identified as the attorney for R & N, though as in the case of the first agreement, the land sale proceeds were to be held in a trust account managed by Combs.[36] The Agreement Regarding Sale of Real Estate Property further provided that the proceeds from the land sale were to be used to satisfy tax liabilities and other encumbrances associated with the R & N company [37] and that all disbursements from the trust account were to be approved by Rasel, Ayesha and R & N. After all disbursements were made, 75% of the remaining balance would be paid to Rasel and 25% to Ayesha.[38]

¶ 23 Combs, in accordance with the agreement, paid taxes and other expenses of R & N. Included in the disbursements was a $200,000 check to Rahman. The $200,000 was authorized for release in a letter to Combs from Ayesha.[39] The letter stated that Ayesha was acting on behalf of Rasel because his whereabouts at that time were unknown.[40] Combs also withdrew $10,000 for his own personal use. Rahman, as president of R & N, gave Combs permission to withdraw the money as a loan, but Combs did not receive permission from either Rasel

**35.** There is information regarding Rasel, Ayesha and R & N which does not directly affect the issue but bears importance in explaining the situation as a whole and also indicates the character of certain individuals involved.

Rasel formed the corporation R & N Distributing Inc.. It appears that due to Rasel's status as an immigrant and related problems with the United States government, Rasel installed several of his in-laws as the officers and shareholders of R & N. Mr. Mohammed Rahman (Rahman), a brother-in-law of Rasel and Ayesha, was listed as the president of R & N. These in-laws, Rahmen, Rahman's wife, John Leonard (another brother-in-law) and Leonard's wife, were installed as officers and shareholders without their knowledge or permission.

For reasons not completely specified the IRS levied numerous taxes and penalties, testified as reaching hundreds of thousands of dollars, against R & N for which Rahman and the others became responsible. The purpose of the sale of Rasel's and Ayesha's land was to provide money to pay off the accumulated debt of the corporation and any other encumbrances incurred as a result of the IRS situation.

**36.** The Agreement Regarding Sale of Real Estate Property specifically stated that the land sale proceeds will be kept in a trust account "managed by R & N's attorney," who is identified within the agreement as Combs.

**37.** *See supra* note 35.

**38.** Submitted as evidence is another agreement, titled General Agreement, which is handwritten, undated, and appears to have been signed by Rasel. The agreement provides essentially the same terms as the Agreement Regarding Sale of Real Estate Property, stating that after the distribution of necessary payments the remaining money shall go to Ayesha and Rasel. The agreement expands on the disbursements allowed to be made including "any other hidden cost or bad credit that affects those four individuals," assumed as meaning the four in-laws installed as officers and shareholders of R & N.

**39.** The Bar asserts that Ayesha signed this letter only because she was in a vulnerable state due to marital difficulties with Rasel. We find this argument unpersuasive.

**40.** Rasel and Ayesha were having marital difficulties during this time. Rasel had moved from Oklahoma to California but later returned. Upon his return, he hired Craig Brown and initiated the lawsuit and Bar grievance against Combs.

or Ayesha.[41]

¶ 24 The accounting records associated with the trust account were very poorly kept, Combs admits to this failure. Due to the extremely disorganized state of the records it is difficult accurately to state figures disbursed or transferred from the account. We feel it is sufficient to say that funds were transferred by Combs from the trust account to his personal account without permission from Rasel, Ayesha, and R & N, as required in the Agreement Regarding Sale of Real Estate Property.

¶ 25 Rasel and Ayesha claim Combs was their attorney. Combs claims he represented solely R & N.[42] We agree with the trial panel that regardless of the confusion surrounding representation, Combs was aware he was acting as an escrow for the proceeds from the land sale and, from the Agreement Regarding Sale of Real Estate, knew that Rasel and Ayesha had a valid interest in the accounting of those proceeds.[43]

¶ 26 Rasel claims he requested an accounting of the trust account funds in August and was not provided one. Instead, he was informed by Combs that "nothing was spent." Rasel further states that after discovering Combs disbursed $200,000 to Rahman he

hired attorney Craig Brown to sue Combs. In December of 2005 Rasel, through Mr. Brown, requested an accounting of the trust account funds. Rasel claims that he was told by Combs' staff he would receive an accounting and the money in the trust account only if he agreed to fire his attorney.

¶ 27 Combs denies receiving any request from Ayesha or Rasel for an accounting prior to the request from Mr. Brown in December 2005. Combs admits that this accounting was not provided but contends he attempted to provide the accounting to Mr. Brown first. His appointment with Mr. Brown was canceled by the latter, and second, he saw a letter from Rasel to Mr. Brown terminating the latter's employment.[44] Combs states that shortly thereafter he was notified of the Bar's grievance filed against him by Mr. Brown and thus quickly furnished an accounting through his lawyer, Mr. Bill Price. Combs and his staff further deny making any demand for Rasel to terminate Mr. Brown's representation.

¶ 28 In April of 2006 Rasel, Ayesha and Combs entered into a Settlement Agreement as a result of which the civil lawsuit against Combs was dismissed and the Bar grievance withdrawn.[45]

---

41. The respondent's Brief-in-Chief indicates that Combs' testimony at the hearing shows he believed the proceeds from the land sale belonged entirely to R & N. We disagree. The testimony does not state this but rather reiterates that Combs understood the proceeds were to be used for the payment of debt incurred by R & N.

42. There was evidence indicating Combs believed he was representing R & N alone. A letter dated July 9, 2005 from Combs to Rahman and signed by both parties confirmed that Combs was working on behalf of R & N. A second letter dated July 11, 2005 from Combs to Rasel and Ayesha gave notice that Combs considered himself to represent R & N alone and specifically disavows any representation of Rasel and Ayesha.

43. Testimony indicated a belief that no funds would remain in the account after disbursement to creditors and others. This is irrelevant in regards to Rasel's and Ayesha's right to an accounting. They had a valid interest in any potential remainder of funds and therefore also a valid interest in obtaining an accounting of fund disbursements.

44. Mr. Brown testified that he canceled one appointment with Combs but stated the appoint-

ment was rescheduled and canceled the second time by Combs. Mr. Brown also testified that he received a letter from Rasel terminating his employment but that he was subsequently retained by Rasel.

Rasel seems to claim that he terminated Mr. Brown's representation at the insistence of Combs in order to obtain the money in the trust account. Combs claims, and is supported by testimony from others, that Rasel terminated Mr. Brown at the urging of the Bangladesh community. Testimony indicated that in situations of conflict, as here between Rasel, Ayesha and the individuals unknowingly installed as officers and shareholders of R & N who subsequently become responsible for R & N's debt, the Bangladesh community operates as a whole to solve problems without receiving help from outside sources or relying on the American legal system.

45. Rasel claims he was forced by Combs to sign the agreement in order to secure from him money left in the trust account and to avoid further litigation costs. Combs claims the agreement was signed after Mr. Brown and Rasel reviewed the accounting of the trust account and determined there was no dispute. Mr. Brown testified "there were discussions within [Rasel and Rah-

¶ 29 The Bar alleges in count two that respondent violated the provisions of ORPC Rule 1.8(h),[46] ORPC Rule 1.15, ORPC Rule 8.1(b), ORPC Rule 8.4(a), ORPC Rule 8.4(c), ORPC Rule 8.4(d),[47] RGDP Rule 1.3, RGDP Rule 1.4(b), and RGDP Rule 5.2.[48]

¶ 30 Combs specifically admits to a violation of ORPC Rule 1.15 (mishandling of funds) and in essence, concurrently with the specified admission, also admits to violations of ORPC Rule 8.4(a), RGDP Rule 1.3, and RGDP Rule 1.4(b). We accept Combs' admission and find by clear and convincing evidence that his conduct violated those rules and constitutes grounds for the imposition of professional discipline. Our discussion in regards to the violation of Rule 1.15 is the same with respect to count two as it is to count one. We find a lack of clear and convincing evidence that Combs purposely deprived Rasel and Ayesha of the funds by deceit or fraud or that Combs intentionally inflicted grave economic harm. We find Combs guilty of commingling and simple conversion.

¶ 31 The Bar asserts and the trial panel found Combs guilty of a violation of ORPC Rule 1.8(h) (that he made an agreement prospectively limiting his liability to a client for his personal malpractice, or settled a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith) in connection with the Settlement Agreement. **We disagree.** Rule 1.8(h) deals with limitation of liability and is comprised of two components. The first of these bars a lawyer from *prospectively* limiting his liability for personal malpractice. This means that a lawyer may not enter into an agreement, *prior to* providing legal services, by which he reduces, or releases himself of, *future liability* for personal malpractice associated with those legal services. The second component states that if a lawyer settles a claim for *past* liability for personal malpractice, the lawyer must first advise the client or former client, in writing, to seek independent representation in connection with the settlement. A lawyer is not absolutely prohibited from settling a claim of personal malpractice liability, but rather is forbidden from doing so without first advising the lay client of the recommended presence of independent representation.[49] The Settlement Agreement in no way limits Combs' liability for any future legal services provided to Rasel and Ayesha. Nor was the settlement entered into without the advice of independent legal counsel. Rasel and Ayesha were represented by Mr. Brown. **We find no violation of ORPC Rule 1.8(h).**

¶ 32 In regards to the alleged violations of ORPC Rule 8.1(b) and RGDP Rule 5.2 under count two, our discussion is consistent with that made under count one. Our examination of the record **shows an absence of clear**

---

man's] family to get the case settled, so we settled the case."

**46.** The provisions of ORPC Rule 1.8(h), 5 O.S. 2001 Ch. 1, App. 3–A, state: "A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for the lawyer's personal malpractice, or settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith."

**47.** The provisions of ORPC Rule 8.4(d), 5 O.S. 2001 Ch. 1, App. 3–A, state: "It is professional misconduct for a lawyer to: * * * * * (d) engage in conduct that is prejudicial to the administration of justice; ..."

**48.** The Bar in its Reply Brief in Chief asserted violations of additional rules: ORPC Rule 1.8(a), 5 O.S.2001 Ch. 1, App. 3–A, ORPC Rule 1.7, 5 O.S.2001 Ch. 1, App. 3–A, ORPC Rule 5.3, 5 O.S.2001 Ch. 1, App. 3–A, ORPC Rule 1.8(a), 5 O.S.2001 Ch. 1, App. 3–A, and ORPC Rule 1.8(b), 5 O.S.2001 Ch. 1, App. 3–A. "The fundamentals of due process are applicable in lawyer disciplinary proceedings. The Bar must allege facts sufficient to put the accused lawyer on notice of the charges and afford the respondent ample opportunity to defend against the allegations." *Eakin, supra* note 4 at ¶ 15, 914 P.2d 644. We find that Combs was not placed on notice of these charges and therefore refrain from ruling on the alleged violations.

**49.** *See State ex rel. Okla. Bar Ass'n v. Sheridan,* 2003 OK 80, ¶ 36, 84 P.3d 710, 717; *State ex rel. Okla. Bar Ass'n v. Tully,* 2000 OK 93, ¶ 13, 20 P.3d 813, 816; *State ex rel. Okla. Bar Ass'n v. Busch,* 1998 OK 103, ¶ 29, 976 P.2d 38, 50; *State ex rel. Okla. Bar Ass'n v. Donovan III,* 1997 OK 2, ¶ 1, 934 P.2d 325, 326; *State ex rel. Okla. Bar Ass'n v. Busch,* 1993 OK 72, ¶ 13, 853 P.2d 194, 196.

and convincing evidence to support the allegations.

■ ¶ 33 The trial panel found Combs guilty of a violation of ORPC Rule 8.4(c) (that he engaged in conduct involving dishonesty, fraud, deceit or misrepresentation). Combs denies this violation and we do not find clear and convincing evidence that the respondent acted dishonestly or with the intent either to defraud or to deceive. Combs admits to converting the funds for his own use while believing he had proper permission to do so. The Bar and the trial panel contend that Combs misrepresented the status of funds to Rasel and refused to give him an accounting. Combs denies receiving such requests. Our view is that given the record evidence in regards to Rasel's character[50] his word alone is not to be regarded as sufficient to establish clear and convincing proof of a violation.

¶ 34 The trial panel issued no specific ruling in relation to a violation of ORPC Rule 8.4(d) (that Combs engaged in conduct that was prejudicial to the administration of justice) and Combs neither admits nor denies a violation. This rule, properly understood, sanctions conduct that interferes with the administration of "judicial process." It covers only severe interference with judicial proceedings or conduct of such a severe nature that it harms our system of representative litigation as a whole.[51] **We find an absence of clear and convincing evidence to support this allegation.**

## IV

## MITIGATING CIRCUMSTANCES

■ ¶ 35 Mitigating circumstances may be considered in assessing the appropriate quantum of discipline.[52] The record reveals

factors to be weighed for purposes of mitigation. It states respondent: (1) has been practicing law since 1985 and has never been disciplined for professional misconduct, (2) has acknowledged and apologized for his professional misconduct, (3) has accepted full responsibility for actions and no harm was caused to any client or third party as a result of his professional misconduct, (4) has made full restitution. We take these factors into account in assessing the discipline to be imposed on the respondent today.

## V

## RESPONDENT'S MISCONDUCT WARRANTS A SUSPENSION OF HIS LICENSE TO PRACTICE LAW FOR A PERIOD OF NINETY DAYS; HE IS ALSO DIRECTED TO PAY THE COSTS OF THIS PROCEEDING

■ ¶ 36 A government's license to practice law is conferred not for the benefit of the individual licensee, but rather for that of the public.[53] The disciplinary process, including the imposition of a sanction, is designed not to punish the delinquent lawyer, but to safeguard the interests of the public, those of the judiciary and of the legal profession.[54] Disciplinary sanctions serve not only to deter the offending lawyer from committing similar acts in the future, but also operate to put others on notice that departures from ethical norms will not be tolerated.[55] The measure of discipline imposed upon an offending lawyer should be consistent with the discipline visited upon other practitioners for similar acts of professional misconduct.[56]

¶ 37 This court has pronounced varying levels of discipline in matters involving mishandling of client funds. The disciplinary

**50.** See supra note 35.

**51.** State ex rel. Okla. Bar Ass'n v. Minter, 2001 OK 69, ¶ 24, n. 55, 37 P.3d 763, 774, n. 55; State ex rel. Okla. Bar Ass'n v. Bourne, 1994 OK 78, ¶¶ 8–9, 880 P.2d 360, 362–363.

**52.** State ex rel. Okla. Bar Ass'n v. Giger, 2001 OK 96, ¶ 8, 37 P.3d 856, 863–4.

**53.** Giger, supra note 52 at ¶ 18, at 863–4.

**54.** State ex rel. Okla. Bar Ass'n v. Lowe, 1982 OK 20, ¶ 19, 640 P.2d 1361, 1363; State ex rel. Okla. Bar Ass'n v. Smith, 1980 OK 126, ¶ 21, 615 P.2d 1014, 1018.

**55.** State ex rel. Okla. Bar Ass'n v. Cummings, 1993 OK 127, ¶ 29, 863 P.2d 1164, 1174; State ex rel. Okla. Bar Ass'n v. Hall, 1977 OK 117, ¶ 12, 567 P.2d 975, 978.

**56.** Giger, supra note 52.

range has extended from censure to disbarment, depending in large part on the degree of harm to the client.[57] The trial panel has recommended that respondent be suspended from the practice of law for two years and one day. **We find the recommended discipline too severe.**[58] The Bar has not only failed to demonstrate Combs acted intentionally to defraud or deceive, it has equally failed to show harm to any client. While no two cases are identical, we find that a suspension for a period of ninety days,[59] coupled with imposition of liability for costs incurred in this proceeding is an appropriate measure of discipline that is in keeping with precedent.[60]

## VI

## SUMMARY

¶ 38 In sum, the record bears clear and convincing proof that respondent's participation in unprofessional conduct violates the rules that govern professional responsibility.

---

57. *See State ex rel. Okla. Bar Ass'n v. Gasaway*, 1993 OK 133, 863 P.2d 1189 (attorney disbarred for repeatedly commingling clients' funds, converting property of clients, and other improprieties with client funds); *State ex rel. Okla. Bar Ass'n v. McManus*, 1993 OK 66, 852 P.2d 727 (public censure appropriate discipline for attorney who commingled personal funds in his client's trust account, neglected client concerns and failed to respond to Bar's grievance); *State ex rel. Okla. Bar Ass'n v. Kessler*, 1991 OK 81, 818 P.2d 463 (attorney's license suspended for two years and one day for commingling client funds, use of moneys for unauthorized purposes and misrepresentation to court that funds had been used for designated purpose); *State ex rel. Okla. Bar Ass'n v. Kamins*, 1977 OK 103, 568 P.2d 627 (attorney's license to practice law suspended for four months when insurance claim settlement money was commingled with personal funds, attorney was unable to produce funds at clients' request and repayment was delayed nearly one year); *State ex rel. Okla. Bar Ass'n v. Geb*, 1972 OK 17, 494 P.2d 299 (twelve-month suspension ordered for attorney with prior disciplinary record who commingled and failed to promptly remit client funds).

58. A suspension from the practice of law for two years and one day is tantamount to disbarment. In order to be reinstated, a lawyer suspended for that period of time must follow the readmission procedure crafted for disbarred lawyers. *See* the provisions of Rule 11.1, RGDP, 5 O.S.2001 Ch. 1, App.1–A. That procedure, set forth in the provisions of Rule 11.4, RGDP, 5 O.S.2001 Ch. 1, App. 1–A., entails the following:

"An applicant for reinstatement must establish affirmatively that, if readmitted or if the suspension from practice is removed, the applicant's conduct will conform to the high standards required of a member of the Bar. The severity of the original offense and the circumstances surrounding it shall be considered in evaluating an application for reinstatement. The burden of proof, by clear and convincing evidence, in all such reinstatement proceedings shall be on the applicant. An applicant seeking such reinstatement will be required to present stronger proof of qualifications than one seeking admission for the first time. The proof presented must be sufficient to overcome the Supreme Court's former judgment adverse to the applicant. Feelings of sympathy toward the applicant must be disregarded. If applicable, restitution, or the lack thereof, by the applicant to an injured party will be taken into consideration by the Trial Panel on an application for reinstatement. Further, if applicable, the Trial Panel shall satisfy itself that the applicant complied with Rule 9.1 of these Rules."

59. Reinstatement for a member of the Bar who was suspended for any period of time shorter than two years and one day is not connected with any formal process. An individual suspended for more than two years may be readmitted only through the process identified in Rule 11.1, RGDP, 5 O.S.2001 Ch.1, App. 1–A.

60. *See State ex rel. Okla. Bar Ass'n v. Mayes*, 1999 OK 9, 977 P.2d 1073 (lawyer suspended for six months for commingling and simple conversion and serious deficiencies with respect to supervising and overseeing his non-lawyer assistant and client communications); *State ex rel. Okla. Bar Ass'n v. Williams*, 1995 OK 130, 911 P.2d 905 (previously disciplined lawyer suspended for six months after being found guilty of a conflict of interest, failure to keep property of a third person separate from his own and applying trust account funds for a purpose other than that for which they were entrusted); *State ex rel. Okla. Bar Ass'n v. Wilkins*, 1995 OK 59, 898 P.2d 147 (lawyer suspended for six months for failing to inform two clients of the status of their respective matters, failing to comply with requests for information, commingling and simple conversion of client funds, and for not being honest with a client about his improper retention); *Cummings, supra* note 55 (twice previously disciplined lawyer given a one-year suspension for commingling and conversion of funds by impermissibly taking money entrusted by client for specific purpose and applying it toward a claimed fee); *Johnston, supra* note 20, 863 P.2d 1136 (a four-month suspension imposed for commingling and conversion of funds, a false statement to a court, professional incompetence, failure to act promptly on behalf of his clients and failure to communicate with them).

After a thorough review of the record and upon due recognition of all the factors tendered in mitigation,

¶ 39 RESPONDENT IS ORDERED DISCIPLINED (1) BY SUSPENSION FOR A PERIOD OF NINETY DAYS AND (2) BY IMPOSITION OF COSTS OF THIS PROCEEDING, WHOSE PAYMENT SHALL BE DUE NOT LATER THAN NINETY DAYS AFTER THIS OPINION BECOMES FINAL.

¶ 40 WINCHESTER, C.J., EDMONDSON, V.C.J., HARGRAVE, OPALA and KAUGER, JJ., concur

¶ 41 WATT, J., concurring in part and dissenting in part

I would impose a public reprimand on this respondent.

¶ 42 TAYLOR, J., dissenting

I would impose a greater discipline.

¶ 43 COLBERT, J., not participating