ATTORNEY DISCIPLINARY PROCEEDING
KAUGER, J.:
¶ 1 This matter comes before the Court pursuant to Rule 6 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, Ch. 1, App. 1-A.[1]
On November 19, 2015, the Oklahoma Bar Association (Bar) filed its complaint against Respondent, Scott Robert Helton (respondent/attomey/Helton), alleging one count of misconduct in violation of several of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S. 2011, Ch. 1, App. 3-A, and the RGDP, 5 O.S. 2011, Ch. 1, App. 1-A. This complaint is the result of an investigation begun by the Bar after it received an anonymous letter critical of Helton’s, four-year non-genetic, re *231 lationship with a 91 year-old client, Lonnie Brooks (Brooks).[2]
¶ 2 On May 10 and 11, 2016, the Professional Responsibility Tribunal (PRT) held a hearing on the Bar’s allegations against Hel-ton. Respondent, with counsel, appeared at the hearing. The PRT took testimony from several witnesses, including Helton and Brooks (by deposition). The PRT also admitted a multitude of exhibits, many subject to a protective order and filed under seal. Other than the anonymous complaint filer, there were no unfavorable witnesses.
¶ 3 The PRT filed its Trial Panel Report with this Court on July 13, 2016. Based on what it considered to be the unusual circumstances of this matter, the PRT recommended respondent receive a public reprimand. The Bar recommends Helton be suspended from the practice of law for a minimum of six months, and be assessed costs in the amount of $4,439.47. After de novo review[3] We agree with the PRT, but decline to impose costs.[4]
THE GRIEVANCE AND EVIDENCE
¶ 4 The Bar asserts Helton violated Rules 1.1 [competence],[5] 1.3[diligence],[6] 1.4[keep client informed],[7]1.5[fees],[8]1.8(a) & (c) [busi *232 ness transactions],[9] and 1.15[client property], ORPC,[10] 5 O.S. 2011, Ch. 1, App. 3-A, and Rule 1.3 [discredit] RGDP,[11] 6 O.S. 2011, Ch. *233 1, App. 1-A, based on respondent’s relationship with Brooks, the gifts she gave him and his family, and his handling of various assets and transactions. On April 7, 2011, Brooks hired the respondent to probate the estate of her sister, Betty Groves. She was referred to Helton by someone she knew, and prior to the start of his representation of her during the probate matter, the two were unacquainted.
¶ 5 Helton and Brooks quickly developed a familial relationship that extended beyond the typical attorney-client relationship. Brooks’ husband died in 1987, and she lived alone, rarely leaving her home. With the death of her sister, Brooks lacked any relatives with whom she had close contact. Brooks originally had a will leaving her estate to her sister Betty Groves. After her sister’s death, Brooks began discussing changing her will and updating her estate planning with respondent.
¶ 6 Over the course of the next few years, the respondent helped Brooks execute a will, prepare a will naming him as personal representative of the estate, prepare a Durable Power of Attorney and Advance Directive for Health Care, and name him as the beneficiary of an annuity Brooks possessed, in place of her deceased sister. Brooks also gifted Helton with money and other gifts.
¶ 7 Concerned about Brooks’ desire to make him the beneficiary of the annuity, Helton contacted Attorney Charles Swartz (Swartz) to meet with Brooks and discuss the matter with her. Helton sought Swartz as independent counsel to review and execute the Beneficiary Change Request Brooks desired to make. Swartz, brought another person with him for the review and he did not find Brooks to be incompetent or under Hel-ton’s undue influence. Rather, quite the opposite.
¶ 8 Respondent, and his family, established their relationship with Brooks when they visited her in her home often. In the summer of 2012, Brooks fell while in her home and injured her back. She called respondent, who went to her home and called 911. Helton had her transported to Saint Francis Hospital. After a period in the hospital, Brooks was eventually transferred to a facility called Montereau for rehabilitation. She then returned home with full-time home healthcare arranged by respondent, but due to costs, she moved back into the assisted living wing of Montereau. Brooks was eventually transferred to the nursing home section of Mon-tereau, which she was unhappy with, and with the attorney’s help moved to a different facility called the Arbors, where she now lives and apparently loves.
¶ 9 In the process of caring for Brooks, Brooks directed the respondent precisely as to her wishes. On August 2, 2012, Brooks authorized Helton and his wife as joint account holders with rights of survivorship to Brooks’ bank account at F&M Bank in order to enable the Heltons to pay Brooks’ bills. By August 14, 2012, Helton and his wife had access and joint ownership of all cash assets belonging to Brooks. Sometime before September 8, 2012, Brooks informed Helton that she wanted to change her will to make him the beneficiary of her estate. Respondent again asked Swartz to contact Brooks and discuss the matter with her. Swartz again brought another person with him, and Helton was not involved in the discussion. Brooks executed a new will, prepared by Swartz, leaving her entire estate to Helton. On the same date, Brooks executed a transfer on death deed, also prepared by Swartz, which would transfer the title of her home to Respondent upon her death.
¶ 10 Respondent testified that once it became apparent Brooks was not going to be moving out of the Arbors and back home anytime soon, he discussed with her the possibility of renting her home in order to generate extra income for her. She agreed, and Brooks recommended placing the home into an LLC. for purposes of limiting her potential liability from renting her home. Accordingly, on March 13, 2013, Helton filed documents with the Oklahoma Secretary of State, that he had prepared, creating Lonnie Brooks Enterprises, LLC. and on March 27, 2013, Brooks executed a Warranty Deed prepared by Helton, which transferred the title of Brooks’ home to Lonnie Brooks Enterprises, LLC.
*234 ¶ 11 On July 26, 2013, Helton filed documents with the Oklahoma Secretary of State that he prepared which created Helton Properties, LLC. As with the Lonnie Brooks Enterprises, LLC., no documents were created indicating who owned and who managed Hel-ton Properties, LLC. According to Helton, he and his wife are the sole owners of Helton Properties, LLC., and he is the manager.
¶ 12 Because rental of Brooks’ home was going well, the attorney suggested liquidating the annuity (worth roughly $200,000) of which he was the beneficiary, and buying two additional rental properties. He cashed the annuities owned by Brooks and caused two additional rental properties to be purchased by Helton Properties, LLC. According to Helton, he and Brooks had an agreement that he would manage the properties owned by Helton Properties, LLC. and pay himself one third of the rental payments for doing so, with the remainder being used for the benefit of Brooks. Brooks’ deposition reveals she agreed to this arrangement, and was aware of the details. The attorney did not memorialize the agreement in writing, advise Brooks that she should have an independent counsel i-eview the agreement, or obtain written informed consent from Brooks concerning the transaction.
¶ 13 At the May 10, 2016, PRT hearing, counsel for the Bar announced that Lonnie Brooks did not disagree with nor did she disavow the attorney’s conduct. The Bar’s opening statement summarizes the level of complaint that Brooks had regarding Helton, or rather, the level of complaint she lacked. It provides:
You’re not going to hear — you’re not going to hear complaints from Lonnie Brooks. As we mentioned before we started, Lonnie Brooks will testify by deposition, but she’s not upset with Scott Helton. She doesn’t disagree with his actions. She’s perfectly happy with everything he’s done. I understand that makes my case hard, but it’s for all those reasons and as you hear and read her testimony, it’s the client like Mrs. Brooks that requires Mr, Helton to follow these rules to a T because he’s the one that has to know these rules, protect her, because at some point she just decided to let him decide everything. That’s why she’s okay. She’s okay with the gifts. You’re going to hear about management fee reimbursements in their business partnership. She’s okay with those, but you’re also going to hear that she doesn’t know a lot of level of detail about those things because she decided to let Mr. Helton decide everything.
You are not going to hear from me that Mr, Helton did everything wrong. I’m going to ask for your patience because I want to tell the whole story of their relationship, but Mr. Helton followed the rules and sought independent counsel in two circumstances.
In other words, Ms. Brooks wanted Helton to handle everything, and she got exactly what she wanted, but because she was elderly and did not want to be bothered with details, everyone else determined that she should not have been allowed to do what she wanted with her money. Disposing of one’s property is a basic right of every citizen.[12]
¶ 14 The most telling evidence comes directly from Ms. Brooks herself. Her deposition testimony was taken on April 28, 2016, and entered into evidence during the PRT proceedings. She explained on direct examination that:
1. She and Helton had become good friends, and that he helped her and talk with her.
2. When she fell in June of 2012, she did not call 911, rather she called Helton for help and he called 911.
3. She loved Helton and his wife and kids and that “nobody could come close” and that they loved her too.
4. When she told Helton that she wanted to make him her beneficiary of her annuity, he did not want to do it and he referred her to another lawyer.
*235 5. The other lawyer and a lady from his office visited with her about the annuity, they questioned her, explained what it meant to change a beneficiary and made certain that it was her intention and her decision, and hers alone, to make the change because she did not have anybody else to leave it to.
6. She considered Helton and his wife and kids her family. Helton has lunch with her once a week, his wife and kids visit her regularly, and they exchange Christmas presents and celebrate Christmas together.
7. She discussed everything with Helton, authorized him to rent her house, authorized him to convey to the Lonnie Brooks Company and Helton Properties and she did it to ensure that she had enough money for her care and medical care.
8. She authorized Helton and his wife to handle her money, pay her bills, and be on her accounts and that was exactly how she wanted things.
9. She agreed to have Helton purchase additional houses for additional income because of her fear that she might not have enough money for future medical care.
10. She was completely satisfied with the way her property was transferred and managed and Helton offered to put everything back to how it was before he did anything for her and she did not want him to do that.
¶ 15 Throughout her testimony she was lucid, direct, and factual. Not only was she in great mental shape, but it also appears she was very healthy, because she did not take any prescription medications. On cross examination she became very agitated asking or stating:
1. Do you have to go through that whole book?
2. Why do you want to know all this?
3. He [Helton] doesn’t tell me what to do.
4. Well, I’ve got sense enough to do things by myself.
5. How much longer?
6.1 just want to get it over with.
7.I thought you said you weren’t going to go through the book.
8. You’re asking questions a long time. ... And I’m an old woman.
9. Why do you want to know all that?
10. Let’s quit. I’m tired of the same questions.
11. Oh, my God. Such a question.
Clearly, Ms. Brooks was neither a willing participant nor a complainant. She appeared perfectly satisfied with what Helton had done for her and perfectly satisfied that her estate planning was set up exactly how she intended.
¶ 16 In a document dated July 11, 2014, which Ms. Brooks signed herself and had a witness sign, Helton reiterated, in writing, all of their transactions together, what he had done for her and whose names were on what holdings. He notified her that if she was unsure about any of their arrangements, she could meet with another lawyer at any time.
¶ 17 Also telling, and perhaps most convincing, comes from the testimony of the man who served as the administrator of the facility where Ms. Brooks lives. He was on hand, watching the daily interaction of Helton and Ms. Brooks. His thirty pages of testimony revealed the following:
1. He was both a licensed practical nurse as well as a licensed administrator for assisted living centers.
2. At least one of the Heltons visited Ms. Brooks almost everyday and brought their kids to see her.
3. The respondent would always bring in the mail to Ms. Brooks, go over it with her, sit down on a monthly basis and go over all of the information from her checking account, go over statements and “stuff like that.”
4. He believed if it were not for the Hel-tons, Ms. Brooks would not be alive because they treated her like family and kept her from being lonely and made her happy.
5. The Heltons provided Ms. Brooks with anything and everything she needed.
6. He had personally met with Ms. Brooks alone to make sure she was not vulnerable or being taken advantage of and he was certain that everything Helton did was exactly as Ms. Brooks directed him.
*236 ¶ 18 Finally, the respondent testified and explained his actions. He said:
The explanation for this is my — in my mind, in December of 12 when her — well, whatever date her [sister’s] probate ended, that was, in my mind, the last thing that I did for her as her attorney. I already knew her well. My family knew her well. We continued to take care of her, help her with doctors’ visits, buy her clothes when she needed it, everything in my mind a family member would do for a grandmother. We were very close, and that developed over a period of time. I was trying to help her in doing this. I didn’t think .about whether or not I was acting as her attorney because in my mind, I was not. I didn’t think about having Mr. Swartz or anyone else come back to meet with her because I didn’t see it as a gift. To me, like the changing the will was or the annuity was, it didn’t — it didn’t cross my mind that she would need independent counsel for these transactions. I was trying to help and that’s why I did this. I didn’t charge her forMedieaid planning. I didn’t prepare, you know, a new will or anything like that. You know, there’s been some discussion about' this— you know, an estate plan for her. I didn’t see it as that. I saw this as if my grandmother was in a similar situation, this is things that I had seen other people do for their family, and I had — I had over time developed a relationship with her and my family that I prepared these documents not thinking about practicing law hr doing it for her or acting as her attorney, or you know, hiring someone else to come in and consult with her on that.
¶ 19 What the respondent describes is exactly what the record reflects. He even offered to “undo” everything for her when the anonymous complaint was filed and she would not let him. Complainant asserts respondent violated the Rules based on his relationship with Ms. Brooks and his handling of various assets and transactions.
¶20 Helton has no previous disciplinary history. After the investigation began, he committed all of his agreements with Ms. Brooks to writing and she readily agreed. She maintained throughout that Helton was doing exactly what she wanted him to do. No one disputes that Ms. Brooks was competent and that she did not want to undo anything Helton did. It is unquestionable from the evidence that respondent and his family have developed a close personal relationship with Ms, Brooks and that they care for her and she cares for them and that respondent was attempting to provide for Ms. Brooks and her future care.
DISCIPLINE TO BE IMPOSED
¶ 21 The PRT determined that clear and convincing evidence shows that Helton violated several of the ORPC. Respondent appears to not contest some of these conclusions, noting in his Brief in Chief that the evidence supports the Trial Panel’s conclusions regarding Rules 1.1., 1.3,1.4, and 1.8(a).[13] Complainant agrees. It should be noted that Helton did not see himself as Brooks’ legal counsel after the conclusion of the probate of her sister’s estate. However, an attorney-client relationship can be established by a reasonable subjective belief of the client.[14]
¶ 22 Respondent took numerous legal actions in Brooks name and on her behalf and continued to provide estate planning and other services to Brooks throughout the time period at issue in this matter. He neglected to prepare an operating agreement for Lonnie Brooks Enterprises, LLC. indicating who owned or managed it. Helton received multiple and substantial cash gifts from Brooks and failed to document them in any way. He failed to document his business relationship *237 with Brooks concerning Helton Properties, LLC. The attorney overpaid himself from Helton Properties, LLC., due to his failure to properly account for how much he was owed for the management of the rental properties, based on an unwritten agreement.
¶ 23 In the process of transferring Brooks’ assets to himself and his wife, Brooks potentially exposed them to his own liabilities while he simultaneously undercut Brooks’ will, which had been reviewed by independent counsel. In the end, Helton has transferred most of Brooks’ assets to himself, inter vivos, with next to no independent review. While there is no evidence the attorney intentionally did this to avoid probate of Brooks’ estate, as Complainant suggests, the sum total of his conduct at the very least, demonstrates a technical violation of 'Rules 1.1 and 1.3, ORPC.
¶ 24 Complainant also asserts Helton violated Rule 1.4, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, which requires prompt communication from attorneys to clients and requires clients be kept reasonably informed and give informed consent to matters related to the representation.[15] Respondent violated the provisions of Rule 1.4 by entering into a business transaction with Brooks (Helton Properties, LLC.), where he did not reduce the terms to writing, did not advise Brook’s of the desirability of seeing independent counsel, and did not obtain Brooks’ informed written consent as to the essential terms of the transaction, his role, and whether he was representing Brooks. Even though the evidence shows that Brooks was fully informed and acquiesced to the terms, clear and convincing evidence in the record supports a determination that the attorney technically failed to comply with the requirements of Rule 1.4, ORPC.
¶ 25 Complainant asserts that Helton violated Rule 1.5, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, which concerns the propriety of attorney fees.[16] Complainant alleges Helton violated Rule 1.5 when he overpaid himself from the Helton Properties, LLC., bank account. The PRT did not make a specific finding concerning Rule 1.5.- Given the evidence in the record, Helton’s agreement to take a management fee in exchange for managing investment properties on behalf of Brooks is not a traditional fee arrangement for legal services but rather part of a business agreement between Helton and Brooks because he was essentially making investments on her behalf.[17] Rule 1.5 is inapplicable to the corresponding facts, and clear and convincing evidence does not exist in the record to support Complainant’s allegations.
¶ 26 Complainant also asserts - that the attorney violated ■ Rule 1.8(a) and (c), ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, concerning business transactions with clients' and solicitation of gifts.[18] The PRT found clear and convincing evidence in the record that-he violated Rule 1.8(a), and we agree. By forming Helton Properties, LLC., amassing rental properties, and managing them on Brooks’ behalf, Helton entered into a business transaction with Brooks. He did so without: 1) fully disclosing the terms of .the transaction in writing; 2) advising Brooks in writing about the desirability of obtaining independent counsel; and 3) obtaining written informed consent in a reasonable amount of time from Brooks.
¶27 Complainant also asserts that Helton violated Rule 1.8(c) by preparing and executing a deed that transferred title to Brooks’ home (worth approximately $100,000) from Lonnie Brooks Enterprises, LLC. to Helton Properties, LLC. Per Hel-ton’s testimony, Brooks was the owner of the former and Helton owner of the latter, The attorney argues that no violation of Rule 1.8(c) occurred. He asserts there is no evidence in the record that he solicited the transfer as a gift to himself, and no evidence that Brooks intended the conveyance to make a gift to Helton, or that he accepted it as such. We agree with respondent.
*238 ¶ 28 Rule 1.8(c), ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, does not set out in detail the requirements for a conveyance to be deemed a “gift” under its terms.[19] Though the attorney effectively took legal title to Brooks’ home when it was transferred to Helton Properties, LLC. (along with other assets of Brooks), the record does not contain evidence of either donative intent on the part of Brooks or acceptance of a gift by the attorney. Rather, the evidence in the record suggests that the propei*ty was transferred, with Brooks approval, to Helton Properties, LLC, to- be held on her behalf in order to generate income for her. Regardless of the wisdom of that decision or the fact that Brooks’ goals might have been accomplished using a trust or some other means, there is no evidence that this transfer was meant as a gift to the attorney.
¶29 Complainant also alleges Helton violated Rule 1.15(a), ORPC, 5 O.S. 2011, Ch. 1, App. 3-A[20], by overpaying himself from the funds in the bank account belonging to Helton Properties, LLC.; because those funds were supposed to be held for the benefit of Brooks. Respondent argues because there is no evidence that he acted intentionally with regards to the overpayment, and no evidence of harm to Brooks, he did not commit simple conversion. Intent is a required element of the third level of culpability, misappropriation, which occurs when an attorney has purposefully deprived a client of money through deceit and fraud or when a lawyer has intentionally inflicted grave economic harm in mishandling clients’ funds.[21]
¶30 Intent is not, however, necessary to prove simple conversion.[22] In State ex. rel. Okla. Bar Ass’n v. Combs, 2007 OK 65, ,¶ 10 & 17, 175 P.3d 340, for example, this Court determined an attorney committed commingling and simple conversion when he settled a wrongful death suit and deposited the settlement proceeds into his trust account, and then, because of a miscommunication with his staff, inadvertently deposited almost the entire settlement amount into his operating account and used the money for personal expenses. Accordingly, this Court finds Complainant has proven by clear and convincing evidence that Respondent committed simple conversion in violation of Rule 1.15, ORPC, when he overpaid himself from the Helton Properties, LLC., account by writing various checks to contractors for the construction of his home.
¶31 Complainant also alleges that, by committing the actions detailed above, Respondent has violated Rule 8.4(a), ORPC, 5 O.S. 2011, Ch. 1, App. 3-A[23], as well as Rule 1.3, RGDP, 5 O.S. 2011, Ch. 1, App. 1-A.[24] Clear and convincing evidence in the record supports a determination that Respondent violated Rule 8.4(a), ORPC, by *239 committing violations of the Oklahoma Rules of Professional Conduct, and violated Rule 1.3, RGDP by committing acts contrary to prescribed standards of conduct which bring discredit upon the legal profession. While the attorney may not have had any ill intent, his multiple rule violations and general carelessness during his representation of an elderly client reflect poorly on the legal profession.
¶32 In disciplinary proceedings, the responsibility of this Court is not to punish, but instead to inquire into and gauge a lawyer’s continued fitness to practice law, with a view to safeguarding the interest of the publie, of the courts, and of the legal profession.[25] Discipline should always be administered fairly (i.e. evenhandedly), but this Court recognizes that the extent of discipline must be decided on a ease-by-case basis because each situation will usually involve different transgressions and different mitigating circumstances.[26] To arrive at appropriate discipline, one fit factor to consider is the deterrent effect upon both the offending respondent and other attorneys who might contemplate similar conduct in the future.[27] Other factors properly considered include comparing the circumstances in the matter at hand with previous disciplinary matters, and examining an attorney’s past record of professional behavior.[28] Mitigating circumstances may also be considered in gauging the proper measure of discipline.[29]
CONCLUSION
¶ 33 The Court recognizes the circumstances of this cause are very unusual. The respondent has no previous disciplinary history and after the Bar began communicating with him, he committed all of his agreements with Brooks to writing. Brooks continually expressed that Helton was doing exactly what she wanted him to do. Upon discovering the extent of his overpayment to himself from the Helton Properties, LLC., account, he ceased payments to himself for managing the properties and has since made up the difference. It is unquestionable from the evidence that Respondent and his family have developed a close personal, familial, relationship with Brooks and that they care for her and she cares for them. Helton was merely attempting to provide for Brooks and her future care. Brooks benefited from Hel-ton’s representation and Helton has fully complied with every aspect of the disciplinary process in this matter.
¶ 34 Complainant argues Respondent should be suspended from the practice of law for a minimum of six (6) months and be assessed the costs of these proceedings. The PRT recommends that Respondent receive a public reprimand, given the unusual facts and mitigating circumstances of this cause. Given the nature of the technical rule violations and the evidence in favor of mitigation, it is the determination of this Court that Respondent shall be publicly reprimanded, but not ordered to pay costs in the amount of $4,439.47.
RESPONDENT IS PUBLICLY REPRIMANDED; NO COSTS IMPOSED.
GURICH, V.C.J., KAUGER, WATT, and EDMONDSON, JJ.,; BUETTNER, S.J., concur.
COMBS, C.J., (by separate writing), WINCHESTER, COLBERT AND WYRICK (by separate writing), JJ., dissent.
REIF., J., not participating.

. Title 5 O.S. 2011 Ch. 1, App. 1-A, RGDP, Rule 6.1 provides:
Formal proceedings in matters involving misconduct by lawyers shall be brought by direction of the Professional Responsibility Commission,
The proceeding shall be initiated by a formal complaint prepared by the General Counsel, approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court. Upon the expiration of the respondent’s time to answer, the complaint and the answer, if any, shall thereupon be lodged with the Clerk of the Supreme Court and the complaint, as well as all further filings and proceedings with respect thereto, shall be a matter of public record. Nine copies shall be filed with each original instrument.

. The Bar publishes on its website, www.okbar. org, general information about the lawyer complaint process. In it, the Bar warns that "[b]y law, any grievance you want to make against an attorney must be in writing and must be signed.” At the bottom of page three of the grievance form, the Bar again warns that "[t]his grievance form must be signed before it can be considered.” The above requirements are made so that grievances comply with Rule 5 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, Ch. 1, App. 1-A which provides in pertinent part:
(a) Each grievance or request for investigation (grievances and requests for investigation both being hereinafter referred to as a “grievance”) involving a lawyer or involving the unauthorized practice of law, shall be in writing and signed by the person filing the same, except that the General Counsel or the Commission may, in their discretion, institute an investigation on the basis of facts or allegations involving a lawyer or the unauthorized practice of law brought to their attention in any manner whatsoever. A lawyer or any other person will be immediately notified of the receipt of a grievance and furnished a copy thereof.

. State ex rel. Okla. Bar Ass'n v. Boone, 2016 OK 13, 367 P.3d 509; State ex rel. Okla. Bar Ass'n v. Conrady, 2012 OK 29, 275 P.3d 133; State ex rel. Okla. Bar Ass'n v. Wilcox, 2009 OK 81, ¶ 2, 227 P.3d 642.

. The factual and legal determinations of the PRT are not binding on this Court, and any recommendations are merely advisory. State ex rel. Okla. Bar Ass'n v. Boone, see note 6, supra at 3; State ex rel. Okla. Bar Ass’n v. Trenary, 2016 OK 8, ¶ 6, 368 P.3d 801; State ex rel. Okla. Bar Ass’n v. Conrady, see note 6, supra. We ensure that the Bar has established charges of misconduct by clear and convincing evidence. State ex rel. Okla. Bar Ass'n v. Mirando, 2016 OK 72, ¶ 3, 376 P.3d 232; State ex rel. Okla. Bar Ass’n v. Boone, see note 6, supra at 3; State ex rel. Okla. Bar Ass'n v. Trenary, see note 7, supra.

. Rule 1.1, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides:
A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

. Rule 1.3, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides:
A lawyer shall act with reasonable diligence and promptness in representing a client.

. Rule 1.4, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides:
a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules; (2) reasonably consult with the client about the means by which the client’s objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when tire lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

. Rule 1.15, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides in pertinent part:
(a) A lawyer shall not make an agreement for, charge or collect an unreasonable fee or an unreasonable amount for expenses. ...
(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or *232 within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.
(c)A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement staling the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of determination. ...

. Rule 1.8, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides in pertinent part:
(a)A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
(1) the transaction and terms on which die lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;
(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing die client in the transaction. ...
(c) A lawyer shall not solicit any substantial gift from a client, including a testamentary gift, for the lawyer or a person related to the lawyer. Nor shall the lawyer prepare on behalf of a client an instrument giving the lawyer or a person related to the lawyer any substantial gift unless the lawyer or other recipient of the gift is related to the client. For purposes of this paragraph, related persons include a spouse, child, grandchild, parent, grandparent or other relative. ...

. Rule 1.5, 5 O.S. 2011 Ch. 1, App. 3-A, Oklahoma Rules of Professional Conduct provides in pertinent part:
(a) A lawyer shall hold property of clients or diird persons that is in a lawyer’s possession in connection with a representation separate from the lawyer’s own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of tire representation.
(b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account but only in an amount necessary for that purpose.
(c) A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.
(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(e) When in connection with a representation, a lawyer possesses funds or other property in which both the lawyer and another person claim interests, the funds or other property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved, and the undisputed portion of the funds shall be promptly distributed.
(f) Where funds or other items of property entrusted to a lawyer have been impressed with a specific purpose as to their use, they shall retain that specific character unless otherwise authorized by a client or third person or prohibited by law. Where funds are impressed with a specific purpose, a lawyer may not subject them to a counterclaim, set off for fees, or subject them to a lien. ...

.Rule 1.3, 5 O.S. 2011 Ch. 1, App. 1-A, Oklahoma Rules Governing Disciplinary Proceedings provides:
The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

. Disposing of property is an inalienable natural right throughout a person's lifetime. In re Estate of Jackson, 2008 OK 83, ¶ 15, 194 P.3d 1269; Snodgrass v. Snodgrass, 1924 OK 597, 107 Okla. 140, 231 P. 237. Disposition of property after death and the right to inheritance are protected by statute. In re Estate of Jackson, supra.

. Rule 1.1, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 9, supra; Rule 1.3, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 11, supra; Rule 1.4, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 7, supra; Rule 1,8, ORPC, 5 O.S. 2011, Ch, 1, App. 3-A, see note 9, supra. Both Rule 1.1. and 1,4 wer.e amended effective September 19, 2016, after this cause commenced.

. State ex rel. Okla. Bar Ass'n v. Rouse, 1998 OK 56, ¶ 9, 961 P.2d 204. Even though the attorney-client relationship rests on contract, it is not necessary the contract be express or that a retainer be requested or paid. The contract may be implied from the conduct of the parties State ex rel. Okla. Bar Ass'n v. Green, 1997 OK 39, ¶ 19, 936 P.2d 947.

. Rule 1.4, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 7, supra.

. Rule 1.5, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 10, supra.

. See Rule 1.8, Comments, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A.

. Rule 1.8, 5 O.S. 2011, Ch. 1, App. 3-A, see note 9, supra.

. The general requirements for a gift of realty are illustrative. Gifts of realty are governed by the principles of personal property law. An essential element of a gift is the donor’s intent to gratuitously pass the title to donee. Larman v. Larman, 1999 OK 83, ¶ 8, 991 P.2d 536; See In re Estate of Estes, 1999 OK 59, ¶ 29, 983 P.2d 438; Davis v. Nat'l Bank of Tulsa, 1960 OK 151, 353 P.2d 482.

. Rule 1.15, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 8, supra.

. State ex rel. Okla. Bar Ass’n v. Combs, 2007 OK 65, ¶ 16, 175 P.3d 340; State ex rel. Okla. Bar Ass’n v. Johnston, 1993 OK 91, ¶ 25, 863 P.2d 1136.

. See, State ex rel. Okla. Bar Ass’n v. Mansfield, 2015 OK 22, 29, 350 P.3d 108; State ex rel. Okla. Bar Ass'n v. Combs 2007 OK 65, ¶¶ 10 & 17, 175 P.3d 340; State ex rel. Okla. Bar Ass’n v. Parsons, 2002 OK 72, ¶¶ 14-16, 57 P.3d 865

. Rule 8.4(a), ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, provides in pertinent part:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

. Rule 1.3, RGDP, 5 O.S. 2011, Ch. 1, App. 1-A, provides:
The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

. State ex rel. Okla Bar Ass'n v. Boone, 2016 OK 13, ¶ 18, 367 P.3d 509; State ex rel. Okla. Bar Ass'n v. Friesen, 2015 OK 34, ¶ 18, 350 P.3d 1269; State ex rel. Okla. Bar Ass'n v. Layton, 2014 OK 21, 34, 324 P.3d 1244.

. State ex rel. Okla. Bar Ass’n. Boone, see note 25, supra; State ex rel. Okla. Bar Ass'n v. Wintory, 2015 OK 25, ¶ 15, 350 P.3d 131; State ex rel. Okla. Bar Ass'n v. Wilcox, 2014 OK 1, 54, 318 P.3d 1114.

. State ex rel. Okla. Bar Ass'n. Boone, see note 25, supra at 19, State ex rel. Okla. Bar Ass'n v. Doris, 1999 OK 94, ¶ 37, 991 P.2d 1015; State ex rel. Okla. Bar Ass’n v. McMillian, 1989 OK 16, 24, 770 P.2d 892.

. State ex rel Okla. Bar Ass’n. Boone, see note 25, supra at 19; State ex rel. Okla. Bar Ass’n v. Taylor, 2003 OK 56, ¶ 22, 71 P.3d 18; State ex rel. Okla. Bar Ass'n v. Doris, see note 31, supra.

. State ex rel Okla. Bar Ass'n. Boone, see note 25, supra at 19; State ex rel. Okla. Bar Ass'n v. Taylor, see note 28, supra; State ex rel. Okla. Bar Ass’n v. Thomas, 1995 OK 145, 911 P.2d 907.