STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MORTENSEN
2023 OK 32
Case Number: SCBD-7095
Decided: 04/04/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2023 OK 32, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

STATE OF OKLAHOMA ex rel., OKLAHOMA BAR ASSOCIATION, Complainant,
v.
THOMAS A. MORTENSEN, Respondent.

BAR DISCIPLINARY PROCEEDING

¶0 Complainant, State of Oklahoma ex rel. Oklahoma Bar Association, charged Respondent, Thomas A. Mortensen, with eight counts of professional misconduct including failure to competently and diligently represent his clients, failure to communicate, collecting an unreasonable fee, mishandling client property, engaging in dishonest conduct, and commission of an act contrary to prescribed standards of conduct. The Tribunal recommended Respondent be suspended for two years and one day. We hold there is clear and convincing evidence that the totality of Respondent's conduct warrants disbarment. Respondent is ordered to pay the costs as herein provided within ninety days after this opinion becomes final.

RESPONDENT DISBARRED AND ORDERED TO PAY COSTS.

Gina L. Hendryx, General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Shiela J. Naifeh, Tulsa, Oklahoma, for Respondent.

ROWE, V.C.J.:

¶1 Complainant, State of Oklahoma ex rel. Oklahoma Bar Association, initiated disciplinary proceedings pursuant to Rule 6 and 6.2A of the Rules Governing Disciplinary Proceedings ("RGDP"), 5 O.S.2011 ch. 1, app. 1-A, alleging eight counts of professional misconduct against Respondent, Thomas A. Mortensen. Complainant's allegations arise in part from several grievances filed against Respondent claiming he mishandled client property, failed to communicate with his clients, and failed to diligently represent their interests. Complainant alleges Respondent's actions are in violation of the Oklahoma Rules of Professional Conduct ("ORPC"), 5 O.S.2011 ch. 1, app. 3-A, and the RGDP and are cause for professional discipline.

PROCEDURAL HISTORY

¶2 On July 15, 2021, Complainant filed a verified complaint containing eight counts of alleged misconduct and requested an immediate interim suspension of Respondent from the practice of law under Rules 6 and 6.2A, RGDP. Complainant also requested an order prohibiting Respondent from withdrawing funds from his client trust account until an audit could be performed.

¶3 On July 26, 2021, this Court ordered Respondent to show cause why an Order of Interim Suspension should not be entered and why an order prohibiting Respondent from withdrawing funds from his client trust should not be entered. In response, Respondent argued that there was no immediate threat of substantial or irreparable harm to his clients. Specifically, he claimed that he was actively trying to distribute funds owed to the clients in the grievances or that he was precluded from doing so for reasons beyond his control. On August 3, 2021, this Court assigned the matter to the Professional Responsibility Tribunal ("Tribunal") for a hearing and recommendation as to whether an Order of Immediate Interim Suspension should be entered. The hearing was held on August 26, 2021, and on September 20, 2021, the Tribunal filed its report, recommending that the Complainant's request for an immediate interim suspension be granted and that Respondent be prohibited from withdrawing funds from his client trust account until an audit of the account could be performed. On September 27, 2021, this Court issued an order suspending Respondent pursuant to Rule 6.2A and further ordered that Respondent be prohibited from withdrawing funds from his client trust account pending an audit.

¶4 On March 3 and 4, 2022, the Tribunal held a hearing on the allegations of attorney misconduct pursuant to Rule 6, RGDP. On May 25, 2022, Tribunal filed its report and recommendation, wherein it unanimously recommended that Respondent be suspended from the practice of law for a period of two years and one day.

STANDARD OF REVIEW

¶5 This Court possesses exclusive jurisdiction in Bar Association disciplinary proceedings. State ex rel. Okla. Bar Ass'n v. Holden, 1995 OK 25895 P.2d 707State ex rel. Okla. Bar Ass'n v. Bolusky, 2001 OK 2623 P.3d 268State ex rel. Okla. Bar Ass'n v. Green, 1997 OK 39

¶6 Our goals in disciplinary proceedings are to protect the interests of the public and to preserve the integrity of the courts and the legal profession, not to punish attorneys. State ex rel. Okla. Bar Ass'n v. Kinsey, 2009 OK 31212 P.3d 1186Id. ¶ 16, 212 P.3d at 1192 (citing State ex rel. Okla. Bar Ass'n v. Doris, 1999 OK 94991 P.2d 1015Id.

BACKGROUND

Count I: The Gibson Grievance

¶7 On May 29, 2017, in the Cherokee County District Court, Michael Cowan was convicted of one count of lewd or indecent proposal to a child. He was sentenced to three years of incarceration. On October 4, 2017, a civil suit was filed in Mayes County District Court against Michael Cowan and his wife, Nelia Cowan, seeking monetary damages on behalf of the victim in the criminal case.

¶8 Following Michael Cowan's conviction, Judy Gibson, Michael Cowan's sister who held power of attorney for him, hired a private investigator, Eric Cullen, to assist in obtaining post-conviction relief for Michael Cowan. On Cullen's suggestion, Nelia Cowan and Judy Gibson hired Respondent to seek post-conviction relief for Michael and to represent both Michael and Nelia in the pending civil suit. On October 30, 2017, Nelia Cowan executed a Power of Attorney and Fee Agreement for the civil suit and paid Respondent a $30,000.00 retainer. Respondent deposited these funds into his trust account.

¶9 According to the docket in the civil suit, Respondent filed an answer to the petition on November 1, 2017. At some point in February 2018, the plaintiff in the civil suit issued a series of discovery requests to Respondent, including interrogatories, requests for production of documents, and requests for admissions. Having received no response, the plaintiff issued a second set of discovery requests in June 2018. The second set of discovery requests contained a request for admission that the damages in the case exceeded ten million dollars. Respondent failed to timely respond to either set of discovery requests.

¶10 Around this time, Respondent contacted Judy Gibson and requested an additional $30,000.00 to continue his representation. Gibson requested an accounting as to the first retainer, but Respondent never provided one. Even so, on June 8, 2018, Gibson wrote Respondent a check for $30,000.00 out of Michael Cowan's checking account. Respondent deposited these funds into his firm's operating account.

¶11 On July 31, 2018, the plaintiff in the civil suit filed motions for summary judgment against both Michael Cowan and Nelia Cowan on the issue of liability. On September 5, 2018, Respondent filed a motion to extend the response deadline for the summary judgment motions, but he never filed a response to the motions for summary judgment. On November 28, 2018, the District Court granted summary judgment against Michael Cowan and Nelia Cowan on the issue of liability.

¶12 On December 6, 2018, the plaintiff filed motions for summary judgment against both Michael Cowan and Nelia Cowan on the issue of damages. A hearing on the motions was set for January 2, 2019. Respondent failed to appear at the hearing. The District Court entered judgments against both Michael Cowan and Nelia Cowan, individually, in the amount of ten million dollars.

¶13 In February 2019, Judy Gibson received notice in the mail from Arvest Bank that Michael Cowan's checking account had been garnished. Gibson contacted Respondent's office and spoke with his legal assistant, Jeril Haug. Haug informed Gibson at that time about the two judgments entered against Michael Cowan and Nelia Cowan.

¶14 With respect to Michael Cowan's criminal case, Respondent never filed an application for post-conviction relief or judicial review. The District Attorney for Cherokee County testified that Respondent contacted him and discussed the possibility of seeking judicial review of Michael Cowan's conviction based upon a potential recantation of one witness's testimony. However, Respondent never filed a formal motion for judicial review.

¶15 Judy Gibson and Nelia Cowan eventually obtained new counsel who assisted them in filing a grievance against Respondent with the OBA on June 4, 2019. Respondent submitted a response to the grievance on February 25, 2020, in which he describes, among other things, (1) his general reluctance to take on representation in either the civil or criminal case, given the low likelihood of success in both; (2) difficulties he experienced in investigating the matters based on Michael Cowan's incarceration and poor health; (3) informal conversations he had with the District Attorney regarding Michael Cowan's options for post-conviction relief; and (4) an incident at his law office where many of his files were destroyed in a fire.

Count II: The Cartwright Grievance

¶16 On February 9, 2012, Tristan Cartwright was convicted on one count of child sexual abuse. He was sentenced to twenty years in prison. Tristan's mother, Tamara Cartwright, and his grandmother, Wanda Kerss, hired Respondent in February 2018 to pursue post-conviction relief for Tristan and a potential malpractice claim against his appellate attorney for failing to timely file a petition for writ of habeas corpus. On February 5, 2018, Kerss paid Respondent a $15,000 retainer, and Tamara provided him with a flash drive containing the files from Tristan's criminal case. Neither Tamara Cartwright nor Wanda Kerss signed a fee agreement with Respondent at this time. At Respondent's suggestion, Tamara also paid Eric Cullen five thousand dollars to assist with the investigation into Tristan's criminal conviction.

¶17 Tamara testified that following their meeting on February 5, 2018, she never met with Respondent again regarding these matters. Respondent never pursued the malpractice case against Tristan's appellate attorney, nor did he file any post-conviction pleadings. Tamara also testified that at one point in the representation, she requested an accounting of how the retainer had been spent. Respondent never provided her with an accounting.

¶18 Tamara filed a grievance with the OBA on August 2, 2019. Respondent submitted a response to the grievance on June 19, 2020, describing, among other things, (1) his general reluctance to take on representation given the low likelihood of success; (2) a conversation he had with Wanda Kerss regarding a refund of the retainer in which she explained that Tamara Cartwright was not authorized to request a refund;

Count III: The Rom Grievance

¶19 Thomas Wright died on March 10, 2016, at St. John's Hospital in Tulsa, Oklahoma, after his treatment plan was changed to "comfort measures only."

¶20 Respondent contacted Rom in September 2018 after the defendants had submitted their discovery requests. Respondent arranged a meeting between himself, Rom, and her sisters on October 16, 2018. During this meeting, Rom and her sisters provided Respondent with the information he needed to respond to the discovery requests. Respondent, however, failed to respond to the discovery requests, and on March 3, 2019, the defendants filed a combined motion to compel the discovery responses and motion to deem requests for admission admitted. On April 4, 2019, the District Court granted the defendants' combined motion, ordering a response to the discovery requests within ten days, and deeming the requests for admission admitted. Respondent never filed a response to the discovery requests.

¶21 On May 7, 2019, the defendants filed a motion for summary judgment. Respondent failed to respond to the motion for summary judgment. A hearing was set for July 24, 2019, on the defendants' motion for summary judgment. Respondent failed to inform Rom or her sisters of the hearing. Neither Rom nor Respondent appeared at the hearing. The District Court issued a series of orders on August 9, 2019, and September 4, 2019, granting summary judgment to the defendants. Respondent did not inform Rom that judgment had been entered in the case. By the time Rom learned of the judgment, the time for appeal had expired.

¶22 Rom filed a grievance with the OBA on December 26, 2019. Respondent submitted a response to the grievance on July 10, 2020, in which he acknowledged his failure to communicate with Rom and explained that after further investigation, he determined the matter was unlikely to succeed.

Count IV: The Booker Grievance

¶23 Shannon Booker was involved in a motor vehicle accident in January 2017 and sustained several injuries. In October 2018, Booker received a settlement offer of $9,300.00 to cover expenses related to treatment of his injuries. However, Booker's medical expenses far exceeded the settlement offer.

¶24 Booker contacted Respondent's office in October 2019 seeking help in settling his medical debts. Respondent eventually agreed to take representation, and in December 2019, Respondent initiated an interpleader action in Tulsa County District Court to disburse the settlement funds and resolve Booker's debts. A hearing on the Petition to Disburse Funds was set for October 6, 2020, at which Respondent announced that the parties had agreed on a settlement and proposed journal entry. The court directed Respondent to file the agreed journal entry within fourteen days of the hearing.

¶25 On February 5, 2021, one of the defendants filed a motion to settle journal entry because Respondent had not filed the agreed journal entry. On March 5, 2021, following a hearing before the court, the agreed journal entry was entered.

¶26 Following their initial meeting when Respondent agreed to represent Booker, Respondent neglected to keep Booker informed as to how his case was proceeding. Booker testified at the hearing before the Tribunal that he made numerous attempts to contact Respondent by phone, in person, and by certified mail. Booker never received a response. Booker testified at the hearing that he was not aware that an interpleader action had been filed, nor was he aware that the case had been resolved.

¶27 Booker filed a grievance with the OBA on January 4, 2021. Respondent submitted a response to the grievance on February 19, 2021. Respondent explained his handling of the interpleader action and that his failure to file the agreed journal entry was due to a change in position by one of the defendants following the October 6, 2020 hearing. Respondent also acknowledged his failure to communicate with Booker and suggested it was due in large part to the fact that he was not able to employ a legal assistant during the relevant time period.

Count V: The Cooper and Cate Grievances

¶28 On or about May 27, 2014, Ray Cooper and Julie Cooper, and their minor children, Robert Neff and Matthew Cooper, ("the Coopers") were involved in a motor vehicle accident. Ray and Julie Cooper retained Respondent to represent them in a personal injury lawsuit. On July 25, 2018, Respondent filed a personal injury lawsuit in Rogers County on their behalf.

¶29 In December of 2019, Respondent settled the suit on behalf of Ray Cooper and Julie Cooper, individually and as parents and next friend of their minor children. On January 8, 2019, both Ray Cooper and Julie Cooper entered and signed Dismissals with Prejudice of their individual claims only. On February 6, 2020, the court entered an order approving a settlement agreement in the minors' friendly suit. Both Ray Cooper and Julie Cooper signed the court order approving the settlement in the minors' case. However, Julie Cooper testified at the hearing before the Tribunal that she did not know what she was signing at the time and that she was not provided with a copy of the order.

¶30 In February and March of 2020, Respondent received nine checks totaling $27,000.00 addressed to the Coopers and several of their medical treatment providers. Respondent did not inform the Coopers that he had received the settlement proceeds. Respondent endorsed the checks on behalf of the Coopers and deposited the same into his client trust account. Respondent withdrew attorney fees in the amount of $10,500.00 and costs in the amount of $438.91 for his work on the Coopers' behalf. After paying himself, a balance of $16,061.09 remained for the Coopers and their lienholders.

¶31 In early 2021, Dr. Thomas E. Cate, a chiropractor who treated Julie Cooper for injuries she sustained in the accident, began reaching out to Respondent about the status of the Coopers' case. Dr. Cate had previously perfected a physician's lien and sent a copy of the lien to Respondent via certified mail. On February 15, 2021, after being unable to contact Respondent, Dr. Cate contacted opposing counsel in the personal injury lawsuit to inquire about the status of the case. Opposing counsel informed Dr. Cate that the case had been settled and dismissed in February 2020.

¶32 After learning of the settlement, Dr. Cate contacted the liability insurance carrier, USAA, and was informed that USAA had issued a settlement check made out to Dr. Cate's chiropractic clinic and Julie Cooper on December 19, 2019. USAA provided Dr. Cate with a copy of the settlement check showing that on March 3, 2020, Respondent had endorsed the check on behalf of Julie Cooper and Dr. Cate's clinic and deposited it into his trust account. Dr. Cate testified at the disciplinary proceedings that he never gave Respondent permission to endorse the check on his behalf.

¶33 Dr. Cate retained an attorney, Lloyd Benedict, to assist him in obtaining the settlement funds to which he was entitled. On March 25, 2021, Benedict sent a letter to USAA and the Bank of Oklahoma ("BOK"), where Respondent's trust account is located, explaining the situation and demanding that the funds be returned. Benedict attached a copy of the settlement check, Dr. Cate's physician's lien, and an affidavit of forgery and unauthorized endorsement from Dr. Cate stating that Respondent was not authorized to endorse the check on his behalf. BOK then drafted the money out of Respondent's account and issued a check for the same amount to Dr. Cate's clinic and Julie Cooper.

¶34 Around the time Dr. Cate discovered that Respondent had deposited the check without his permission, Dr. Cate also contacted Julie Cooper and informed her of what occurred. Dr. Cate also put Julie Cooper in contact with his attorney, Benedict, and suggested he might be able to help her ascertain how her case was resolved and what happened to the other settlement funds. While Julie Cooper never formally retained Benedict as her attorney, he did agree to assist her.

¶35 On May 18, 2021, Benedict sent an email to Respondent inquiring about the settlement funds.

¶36 On June 4, 2021, Respondent emailed Benedict and indicated he was prepared to deliver the settlement packets to Benedict's office later that afternoon. Benedict replied to the email later that day, informing Respondent that Julie Cooper had many questions regarding the settlement sheets they received the previous day. Benedict also stated that he instructed Julie Cooper to take those questions up with Respondent directly because Benedict would no longer be assisting her, given that he was not charging her a fee.

¶37 Dr. Cate filed a grievance with the OBA on February 25, 2021. Respondent failed to respond to the grievance. In or around November 2021, the OBA hired Klingenberg & Associates, P.C., to conduct an audit of Respondent's trust account. As of July 31, 2021, the audit revealed that Respondent's trust account lacked sufficient funds to cover the amounts owed to the Coopers and their lienholders.

Count VI: The Lee Grievance

¶38 Jennifer Lee was injured in a motor vehicle accident on August 15, 2017. Lee was referred to Respondent by her brother to pursue her claim against the tortfeasor. Lee testified at the disciplinary hearing that she did not have a written contract with Respondent, but they had agreed on his fee when she hired him. Respondent filed the lawsuit in the Tulsa County District Court on May 30, 2018. The case was ultimately settled, and Lee filed a dismissal with prejudice on April 24, 2019.

¶39 On April 15, 2019, Respondent received a settlement check for $42,250.00 from the insurance company made out to Lee and several of her medical providers, who had perfected physician's liens for their treatment. Respondent endorsed the check on behalf of Lee and the lienholders and deposited the funds into his trust account on November 13, 2019. Respondent never remitted any of the funds to Lee or the lienholders.

 

¶40 Lee attempted to contact Respondent numerous times after her case was settled to inquire about the settlement funds. On January 5, 2021, she sent Respondent a certified letter asking him to contact her by January 11, 2021, so they could discuss the matter. She obtained proof of delivery from the Post Office showing that "C Rogers" signed for the letter on January 6, 2021, but Lee never received a response. Lee sent Respondent an email on February 11, 2021, inquiring about the settlement again. She received no response.

 

¶41 On March 10, 2021, Lee filed a grievance against Respondent with the OBA. Respondent never submitted a response to the grievance. The audit conducted by Klingenberg & Associates, P.C., revealed that as of December 31, 2019, Respondent's trust account lacked sufficient funds to cover the amounts owed to Lee and her lienholders.

Count VII: The General Counsel Grievance (Lovett)

¶42 Rhonda Lovett and Chad Lovett, as well as their minor children, ("the Lovetts") were involved in a motor vehicle accident on May 23, 2013. Chad Lovett had known Respondent for some time prior, and he and Rhonda decided to hire Respondent to represent them. Respondent filed suit on behalf of Chad Lovett and Rhonda Lovett in Tulsa County District Court in December 2014.

¶43 Respondent settled the case on behalf of Chad and Rhonda in early 2016. On February 12, 2016, Respondent deposited two checks totaling $12,500.00 made out to Chad Lovett and Rhonda Lovett and several of their medical care providers. On July 22, 2016, Respondent made a series of payments to Chad and Rhonda's providers.

¶44 Respondent also initiated a friendly suit in Tulsa County District Court on behalf of the minor children sometime in 2017. The friendly suit was settled on September 13, 2017, and the children received settlement payments totaling $7,000.00. The court issued supplemental orders directing that the settlement funds be deposited into designated accounts for the children set up by their parents at Arvest Bank. On January 29, 2018, Respondent deposited the children's settlement funds into his trust account.

¶45 Rhonda Lovett testified at the disciplinary proceedings that she continued to receive collection calls over the family's unpaid medical bills after their case was settled. She further testified that she attempted to contact Respondent numerous times about directing their remaining settlement funds toward those bills. Despite promises from Respondent and his staff, they never paid the remaining medical bills. Rhonda Lovett testified that eventually she gave up attempting to work with Respondent and began paying some of the medical bills herself. She further testified that she never received the balance of any settlement funds owed to her, her husband, or her children. As of June 30, 2018, Respondent did not have enough funds in his trust account to cover the amounts owed to the Lovetts.

¶46 In his Answer to the Complaint and Request for Interim Suspension, Respondent indicated that another attorney in his office, Katrina Lucas, had been handling the friendly suit on behalf of the Lovett children and distributing the settlement proceeds. However, Lucas testified at the disciplinary proceedings that although she did some work in the friendly suit, she was not primarily responsible for settling the case. Furthermore, Lucas did not have signing authority for Respondent's trust account and, thus, could not have distributed the settlement proceeds.

Count VIII: The General Counsel Grievance (Masingale)

¶47 Tyler Masingale, and several other individuals, were involved in a motor vehicle accident sometime around July 2014. Respondent represented the plaintiffs, including Masingale, in a personal injury suit in Osage County District Court. The case was settled on July 17, 2018, and the court issued a minute order stating:

[T]he $25,000 in policy limits settlement funds will be divided equally with $6,250 to each plaintiff. Attorney Thomas Mortensen will be entitled to his attorney fees and costs from each settlement. The net settlement after attorney's fees and costs of Tyler Masingale shall be paid to the Oklahoma State University Medical Center Trust pursuant to its hospital lien.

On August 31, 2018, State Farm Mutual Automobile Insurance Company issued a check for $6,250.00, addressed to Masingale, Respondent, and the OSU Medical Center Trust.

¶48 On December 20, 2018, Respondent endorsed the check and deposited it into his trust account. That same day, Respondent withdrew $2,500.00 in fees and costs from his trust account for his work on Masingale's case. Respondent failed to remit the remaining portion of the settlement funds, $3,750.00, to the OSU Medical Center Trust pursuant to the July 17, 2018 court order. As of October 30, 2019, Respondent's trust account lacked sufficient funds to cover the amount owed to the OSU Medical Center Trust.

¶49 Kimberly Condon, counsel for the Midland Group, which contracts with the OSU Medical Center Trust to file medical liens and work toward reimbursement of accident claims, began trying to contact Respondent about the Masingale settlement funds in September 2018. Having received no response, on June 22, 2020, Condon submitted a missing endorsement affidavit to the Bank of Oklahoma ("BOK") and requested that they debit Respondent's account $4,375.00. BOK forwarded the information to Respondent and requested proof that he had permission to endorse the check on behalf of the OSU Medical Center Trust. BOK never received a response from Respondent. On July 6, 2020, BOK debited $4,375.00 from his trust account and transferred that amount to the OSU Medical Center Trust.

DISCUSSION

¶50 Complainant submits that Respondent's conduct, as described above, amounts to violations of Rules 1.1, 1.3, 1.4, 1.5, 1.15, and 8.4, ORPC, and Rules 1.3 and 5.2, RGDP.

¶51 Rule 1.1 requires that a lawyer provide competent representation to a client.

¶52 The only instance where Complainant questions Respondent's legal knowledge, skill, thoroughness, and preparation is in his representation of Michael Cowan and Nelia Cowan. Specifically, Complainant alleges that Respondent's decision in the criminal case to seek judicial review of Michael Cowan's sentence rather than post-conviction relief was misguided. Complainant cites to testimony from the District Attorney, Jack Thorp, that post-conviction relief would have been the more appropriate avenue. While it may be fair to question the wisdom of Respondent's choice in handling the matter, we cannot find that his actions constitute incompetent representation. Thus, we find that Complainant has failed to establish by clear and convincing evidence that Respondent violated Rule 1.1, ORPC.

¶53 Rule 1.3 requires that a lawyer act with reasonable diligence and promptness in representing a client.

¶54 Respondent failed to diligently represent Michael Cowan and Nelia Cowan by not responding to the plaintiff's discovery requests and motions for summary judgment in the civil case. Respondent's mistakes in this regard led to two ten million dollar judgments being granted against Michael Cowan and Nelia Cowan. Respondent also failed to diligently represent Michael Cowan in his criminal case by never filing any post-conviction pleadings. The alleged difficulties that Respondent experienced in investigating these matters does not absolve him of the responsibility to timely respond to pleadings and pursue the cases to a conclusion.

¶55 Respondent failed to diligently represent Tristan Cartwright by never pursuing the malpractice claim against his former attorney. Respondent further failed to diligently represent Cartwright by never filing any post-conviction pleadings in his criminal case.

¶56 Respondent failed to diligently represent Keelin Rom by never responding to the defendants' discovery requests and motion for summary judgment. Respondent's failures resulted in summary judgement being granting in favor of defendants. Respondent's explanation that he considered the case unlikely to succeed does not absolve him of his obligation to diligently represent his client.

¶57 Respondent failed to diligently represent Shannon Booker by neglecting to file the agreed journal entry he negotiated with Booker's lienholders by the deadline set by the court. Although it may be true that Respondent was prevented from filing the order due to a change in position from one of the parties, he still had an obligation to keep the court and the parties apprised regarding the delay.

¶58 Respondent failed to diligently represent the Coopers, the Lovetts, Jennifer Lee, and Tyler Masingale by not timely paying their respective lienholders out of the settlement funds they received.

¶59 Rule 1.4 requires that a lawyer maintain communication with the client, including among other things, keeping the client reasonably informed of the status of the matter and promptly complying with reasonable requests for information.

¶60 Respondent failed to keep Michael Cowan and Nelia Cowan reasonably informed by not advising them that summary judgment had been granted against them in the civil case. The Cowans only learned of the judgment when Judy Gibson received a notice from Arvest Bank that Michael's checking account had been garnished.

¶61 Respondent failed to keep Tristan Cartwright and Tamara Cartwright reasonably informed regarding his effort at post-conviction relief. Respondent never met or talked with Tristan or Tamara following Tamara's initial meeting with him. Respondent also never responded to Tamara's request for an accounting of the work he performed on Tristan's case.

¶62 Respondent failed to keep Keelin Rom and her family reasonably informed regarding their medical negligence case against the hospital that treated her father. Specifically, Respondent failed to notify Rom of hearing dates during the proceedings and failed to inform her that the court had granted summary judgment in favor of the defendants.

¶63 Respondent failed to keep Shannon Booker informed regarding the interpleader action Respondent filed on his behalf. Booker made numerous attempts to contact Respondent, including going so far as to send him a letter via certified mail. Despite those attempts, Booker testified at the disciplinary hearing that he still did not know the status of the case.

¶64 Respondent also failed to keep Julie Cooper reasonably informed as to how the settlement funds from her case were being distributed. She did not learn that Respondent had received and deposited the checks addressed to her and her creditors until Dr. Cate informed her that Respondent had improperly endorsed the settlement checks without consent.

¶65 Respondent failed to keep Jennifer Lee reasonably informed of the status of her personal injury case. She too made attempts to contact Respondent via email and certified mail, but she never received a response.

¶66 Respondent also failed to keep the Lovetts reasonably informed regarding the disbursement of their settlement funds. Rhonda Lovett made repeated requests for Respondent to use her family's remaining settlement funds to pay off their outstanding medical bills. However, after receiving insufficient responses and assistance from Respondent, the Lovetts ending up paying some of their bills out of pocket.

¶67 Rule 1.5(a) prohibits a lawyer from making an agreement for, charging, or collecting unreasonable fees.

¶68 Respondent took two $30,000 retainers to represent Michael Cowan and Nelia Cowan in their respective criminal and civil cases. Aside from filing an answer to the petition in the civil case and a motion to extend the response time to the plaintiff's motion for summary judgment, Respondent made no other filings in either matter. He offered no evidence that he rendered services commensurate with his fee, and he failed to render an accounting of how the first retainer was spent, despite a specific request from Judy Gibson. Respondent's wholesale neglect of the civil case that resulted in two ten million dollar judgments being granted against Michael Cowan and Nelia Cowan was certainly not commensurate with his fee. Likewise, his failure to meaningfully pursue post-conviction relief or judicial review in Michael's criminal case was not commensurate with his fee.

¶69 Tamara Cartwright and Wanda Kerss paid Respondent a $15,000 retainer to represent Tristan Cartwright in a malpractice case against his former attorney and to pursue post-conviction relief on Tristan's behalf. Respondent never meaningfully pursued either matter. He failed to render an accounting of how the retainer was spent and failed to refund any unearned portion of the fee. Accordingly, we find that Respondent's representation was not commensurate with his fee.

¶70 Rule 1.15 relates to a lawyer's duties in safekeeping client property. Violations of Rule 1.15 can be sorted into three categories: (1) commingling, (2) simple conversion, and (3) misappropriation. State ex rel. Oklahoma Bar Ass'n v. Combs, 2007 OK 65175 P.3d 340Id. Commingling occurs when client funds are combined with the lawyer's personal funds. Id. at ¶ 14, 175 P.3d at 346. Simple conversion occurs when an attorney applies a client's money to a purpose other than that for which it came to be entrusted to the lawyer. Id. at ¶ 15, 175 P.3d at 346. Misappropriation occurs when an attorney purposely deprives a client of money through deceit and fraud. Id. at ¶ 16, 175 P.3d at 346. A finding of misappropriation, regardless of exceptional mitigating factors, warrants the imposition of harsh discipline. State ex rel. Oklahoma Bar Ass'n v. Mansfield, 2015 OK 22350 P.3d 108

¶71 We find that Respondent converted funds belonging to his clients on several counts. On this point, we note that "[w]here money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose ..., and a refusal to account for and deliver such money or property upon demand shall be deemed a conversion." State ex rel. Okla. Bar Ass'n v. Miskovsky, 1990 OK 12804 P.2d 434

¶72 We also find that Respondent misappropriated funds belonging to his clients and third parties on several counts. Specifically, in his representation of the Coopers, the Lovetts, Jennifer Lee, and Tyler Masingale, Respondent engaged in fraudulent and deceitful conduct by endorsing checks made out to lienholders without their permission. Respondent then failed to remit those funds to the lienholders and likewise neglected to remit the balance of any settlement funds to his clients. The audit conducted by Klingenberg & Associates, P.C., revealed that Respondent's trust account has at various points fallen below the balance sufficient to cover the amounts he owes to these clients and their lienholders. Thus, Respondent has clearly deprived his clients and third parties of money through deceit and fraud, which amounts to misappropriation. See Combs, 2007 OK 65

¶73 Rule 8.4, ORPC, provides that it is professional misconduct for an attorney to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation or to engage in conduct that is prejudicial to the administration of justice.

¶74 Rule 5.2, RGDP, requires that an attorney provide a written response to a grievance within twenty days of receiving it. Respondent failed to timely respond to the Gibson, Cartwright and Rom grievances, and he failed entirely to respond to the Cooper and Cate grievances.

¶75 Based on the foregoing, we find that Complainant has established by clear and convincing evidence that Respondent engaged in misconduct in violation of Rules 1.3, 1.4, 1.5, 1.15, and 8.4, ORPC, and Rule 5.2, RGDP. Furthermore, we find that Respondent has engaged in acts contrary to prescribed standards of conduct and which bring discredit upon the legal profession, in violation of Rule 1.3, RGDP. 

 

AGGRAVATING AND MITIGATING CIRCUMSTANCES

 

¶76 Respondent has been licensed to practice law since October 2001 and has not previously been the subject of any formal discipline. Respondent appeared for the disciplinary hearing and presented two character witnesses, Clay Ijams, an attorney with whom Respondent had previously worked, and District Attorney Jack Thorp. Both Ijams and Thorp testified to Respondent's general character, skill as a lawyer, and concern for his clients.

¶77 Respondent also testified that a series of personal issues disrupted his ability to practice during the relevant time periods. He sustained a back injury in 2014 that ultimately required surgery and interfered with his ability to work for long periods of time. Respondent also testified that he struggles with ADHD and depression, which impact his ability to work. Respondent also identified a series of unfortunate events that interfered with his practice during the relevant times, including the passing of his father, an improper foreclosure on his home, and the partial destruction of some of his office space in a fire.

¶78 Respondent has indicated that he would be willing to pay out any amounts owed to the clients referenced above and requested the OBA lift the freeze on his trust account so he could do so. The OBA requested that Respondent draft a motion and proposed order detailing how much money he planned to distribute and to which clients. The OBA also requested a written confirmation that any funds the Respondent intended to use did not belong to other clients. Respondent never followed through on the OBA's requests.

DISCIPLINE

¶79 Our goals in bar disciplinary matters are to protect the interests of the public and preserve the integrity of the legal profession, not to punish attorneys. Kinsey, 2009 OK 31State ex rel. Okla. Bar Ass'n v. Stewart, 2003 OK 1371 P.3d 1 We must also weigh the deterrent effect of our discipline on the Respondent and the Oklahoma Bar. State ex rel. Okla. Bar Ass'n v. Taylor, 2003 OK 5671 P.3d 18

¶80 We have addressed this type of misconduct on numerous prior occasions. In State ex rel. Okla. Bar Ass'n v. Scott, 2022 OK 1502 P.3d 1101Id. ¶¶ 9-16, 502 P.3d at 1105-07. The respondent ignored numerous requests for an accounting of his services, failed to return any unearned fees, and failed to respond to the grievances filed against him. Id. The respondent also did not participate in the disciplinary proceedings. Id. ¶ 24, 502 P.3d at 1109. We found that the respondent's conduct warranted disbarment. Id. ¶ 29, 502 P.3d at 1110.

¶81 In State ex rel. Okla. Bar Ass'n v. McCoy, 2010 OK 67240 P.3d 675Id. ¶¶ 7-22, 240 P.3d at 680-83. The respondent also failed to adequately communicate with his clients regarding the status of their cases and failed to return unearned fees. Id. He also failed to adequately respond to the grievances filed against him. Id. ¶¶ 23-24, 240 P.3d at 684. We suspended the respondent's license for two years and one day. Id. ¶ 44, 240 P.3d at 690

¶82 In State ex rel. Okla. Bar Ass'n v. Smith, 2016 OK 19368 P.3d 810Id. ¶¶ 2, 21, 368 P.3d at 811, 813. The respondent had also previously received formal discipline in the form of a private reprimand. Id. ¶ 32, 368 P.3d at 816. We found that the respondent's conduct warranted disbarment. Id. ¶ 37, 368 P.3d at 818.

¶83 Based on the foregoing, we find that there are only two forms of discipline that would be appropriate in relation to Respondent's misconduct, suspension for two years and one day or disbarment. Respondent has habitually failed to meet even his most basic obligations as an attorney. He failed to perform services for which he was paid, failed to communicate with his clients, and he converted and misappropriated money belonging to his clients and third parties. His incompetence and neglect exposed his clients to civil judgments and left them without remedies under the law. And worse yet, when confronted with his failures at the disciplinary proceedings, he failed to show genuine remorse over and take full responsibility for the harm he had done. For these reasons, we find that disbarment is the appropriate discipline in this matter.

ASSESSMENT OF COSTS

¶84 On May 25, 2022, Complainant filed an application to assess the costs of the disciplinary proceedings, totaling $19,257.41, to Respondent. Respondent did not file an objection to the application. Rule 6.16, RGDP, provides that in disciplinary proceedings where discipline results, "the cost of the investigation, the record, and disciplinary proceedings shall be surcharged against the disciplined lawyer unless remitted in whole or in part by the Supreme Court for good cause shown." Respondent is hereby ordered to pay costs in the amount of $19,257.41 within ninety days of the date of this opinion.

RESPONDENT DISBARRED AND ORDERED TO PAY COSTS.

Rowe, V.C.J., Kauger, Winchester, Edmondson, Combs, Gurich and Darby, JJ., concur.

Kane, C.J., recused.

Kuehn, J., not participating.

FOOTNOTES

Julie Cooper, a previous client of yours, has retained me to inquire about her settlement funds that you have not disbursed to her. It is my understanding that you owe her approximately $21,000 in net proceeds, plus for any unpaid medical debt that may have not been disbursed as well. I welcome the opportunity to discuss all solutions for this matter with you, including whether you carry malpractice insurance. Please feel free to call me at my office at [] or my cell at []."

I spoke with Ms. Cooper this morning about the balance info needed. She had many questions and concerns regarding the settlement that she had not expressed before seeing your settlement sheets. I informed her that her questions would be best answered by you directly, as I was not charging any fee to assist her to this point. Accordingly, I am no longer assisting Ms. Cooper on this matter. Please contact her with any questions you have."

Evident in the comments, Rule 1.3 primarily imposes an obligation on an attorney to pursue matters on behalf of clients diligently and ultimately bring them to a timely conclusion. Comment 1 indicates that a client's interests should be pursued diligently in spite of opposition, obstruction, or inconvenience. Comment 2 states a lawyer should manage his or her work load appropriately to ensure that each matter is handled competently and in a timely manner. Comment 3 notes that procrastination is perhaps the most widely resented professional shortcoming.

(a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant information on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

(a) A lawyer shall not make an agreement for, charge or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.

[...]

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

[...]

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

[....]

It is professional misconduct for a lawyer to:

[...]

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

[...]

The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.